**FIRST UNION BROKERAGE, Plaintiff,**

v.

**Nick P. MILOS and Catherine P. Milos, Defendants.**

**No. 87–6981–CIV–EPS.**

United States District Court,
S.D. Florida.

May 12, 1989.

Birgitta K. Siegel, Ruden, Barnett, McClosky, Smith, Schuster & Russell, P.C., Miami, Fla., for plaintiff.

Allan Lerner, Fort Lauderdale, Fla., for defendants.

## MEMORANDUM OPINION

SPELLMAN, District Judge.

### ORDER ON PLAINTIFF'S MOTION TO DISMISS DEFENDANTS' COUNTERCLAIM

THIS CAUSE comes before the Court upon Plaintiff's, FIRST UNION BROKER-AGE, Motion to Dismiss, and the Magistrate's Recommendation therein. For the reasons set forth below, it is the opinion of this Court that the Plaintiff's Motion to Dismiss should be denied in part and granted in part.

### PROCEDURAL HISTORY

Plaintiff, FIRST UNION BROKERAGE SERVICES, INC., instituted this action against the Defendants, NICK and CATHERINE MILOS, on December 16, 1987, to collect a debt balance in Defendants' brokerage account totaling $265,500.49. In response thereto, the Defendants asserted a seven (7) Count Counterclaim against the Plaintiff, and therein raised claims for federal and state securities violations, common law claims for fraud, negligence, breach of fiduciary duty and breach of contract.

Subsequent thereto, the Plaintiff filed a Motion to Dismiss the Defendants' Counterclaim. This Court referred the above-styled cause to Magistrate Turnoff for his consideration. Upon review of this matter, Magistrate Turnoff issued a Report and Recommendation, wherein he recommended the following:

1. Motion to Dismiss Counterclaim for Failure to Plead Fraud with Particularity —DENIED;

2. Motion to Dismiss Counterclaim for Failure to State a Cause of Action under Section 12(2)—GRANTED as to Count I of the Counterclaim;

3. Motion to Dismiss Counterclaim for Failure to State a Claim under Fla.Stat. Section 517.301—DENIED;

4. Motion to Dismiss Counterclaim for Failure to Allege Justifiable Reliance— DENIED;

5. Motion to Dismiss Counter Claim for Failure to State a Claim for Fraud as to Future Acts—DENIED;

6. Motion to Dismiss Counterclaim for Failure to Allege Breach of Fiduciary Duty—DENIED;

7. Motion to Dismiss Counterclaim for Failure to State a Cause of Action for Breach of Contract—DENIED;

8. Motion for More Definite Statement as to Count VII—GRANTED.

After a *de novo* review of this matter, this Court makes the following determinations regarding the Plaintiff's Motion to Dismiss the Defendants' Counterclaim.[1]

## FACTS

The Defendants, NICK AND CATHERINE MILOS, maintained a securities account with the Plaintiff, FIRST UNION BROKERAGE SERVICES, INC.[2] In the course of purchasing and/or carrying of common stocks and options in Defendants' margin account, the Plaintiff made loans of monies into this account. This is known as "margin debt," which produces a "margin obligation" upon the Defendants. Due to unfavorable trading conditions in the market, the Defendants' account fell below regulated levels; accordingly, the Defendants were required to deposit marginable securities and/or funds into the account as collateral for the margin debt and to satisfy the margin requirement.

The relationship between the changing value of the Defendants' securities account and Defendants' margin requirement was central to the Defendants' investment decisions. The Defendants maintain that as a result of the shifting status of the margin requirement, the Plaintiff, First Union Brokerage Services, agreed to provide information on a daily basis with respect to those elements of the account which would impact upon decision-making. Defendants also aver that the production of this information on a timely basis was vital due to the volume and the velocity of their securities transactions.

In September 1987, Plaintiff switched to a new clearing broker, Pershing & Co. Inc., and as a result thereof, the Defendants became concerned over Plaintiff's ability to furnish daily trading information with regularity and accuracy. It is alleged that upon expressing this concern to Barry Parillo, First Union's Fort Lauderdale Branch Manager, the Defendants were told that in the event that any margin deficits did arise, Defendants would not be required to satisfy them until November 15, 1987.

Defendants allege that in reliance upon Mr. Parillo's representation, they continued to maintain their account at First Union Brokerage. On October 20, 1987, notwithstanding Mr. Parillo's alleged representation, the Defendants were notified that their account must promptly meet the existing margin requirement or said account would be liquidated. The Defendants failed to meet the margin requirement, and as a result thereof, the account was liquidated. By October 22, 1987, liquidation was complete and the account was left with a negative net worth.

The Defendants maintain that their investment decisions during September and early October 1987 were made in reliance upon Mr. Parillo's statement. But for that statement, Defendants contend that they would have diminished the activity in their account, or, upon the receipt of fully accurate information, would have pulled the account altogether.

## DISCUSSION

### *Failure to Plead Fraud with Particularity*

Plaintiff, First Union Brokerage, filed a Motion to Dismiss Count I (Federal Securities Fraud), Count II (State Securities Fraud), Count III (Common Law Fraud), and Count V (Negligence) of the Defendants' Counterclaim for failure to plead fraud with sufficient particularity as re-

1. In view of the fact that several of the grounds for dismissal have been asserted with respect to more than one count in the Counterclaim, for purposes of clarity, the Plaintiff's Motion to Dismiss will be reviewed ground by ground, rather than count by count.

2. The contract executed between Plaintiff, First Union Brokerage, and the Defendants, the Milos, provided in pertinent part:

 If, in your discretion you consider it necessary for your protection to require additional collateral ... you shall have the right to sell any or all securities, ... to buy any or all securities, commodities and other property which may be short in such accounts, to cancel any open orders and to close any or all outstanding contracts, all without demand for margin or additional margin, notice of sale or purchase or other notice or advertisement. It being understand [sic] that a prior demand or call or prior notice of the time and place of such sale or purchase shall not be considered a waiver of your right to sell or buy without demand or notice.

quired by Fed.R.Civ.P. 9(b). Federal Rule of Civil Procedure 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity."[3] It is well established that claims for securities fraud must meet the requirements of Rule 9(b); accordingly, all averments therein must be pled with sufficient particularity. Rule 9(b), however, must not be read to abrogate the notice pleading policy of Fed.R.Civ.P. 8.[4]

Mere conclusory allegations of fraud, couched in statutory language, will not satisfy Rule 9(b). The allegations "must be accompanied by some delineation of the underlying acts and transactions which are asserted to constitute fraud." *Merrill Lynch, Pierce, Fenner & Smith v. Del Valle*, 528 F.Supp. 147, 149 (S.D.Fla.1981) (Spellman, J.).[5]

■ Upon review of the Defendants' Counterclaim, it is the opinion of this Court that the Defendants have pled their claims for securities fraud with sufficient particularity in accordance with Rule 9(b). In their Counterclaim, the Defendants have identified the alleged misstatement, the approximate date of the alleged misstatement, and the particular party who made the alleged misstatement.[6] Accordingly, it is the view of this Court that the Defendants have complied with the pleading requirements of Rule 9(b), and thus, Plaintiff's Motion to Dismiss is DENIED.

### Failure to State a Cause of Action under Section 12(2)

Plaintiff has filed a Motion to Dismiss Count I of the Defendants' Counterclaim for failure to state a claim under Section 12(2) of the 1933 Act. Liability imposed pursuant to Section 12(2) of the Securities Act of 1933 is restricted to a "person who ... offers or sells a security ... by means of a prospectus or oral communication." The phrase "prospectus or oral communication" refers to a prospectus, registration statement, or other communication related to a batch offering of securities, not to subsequent trading. *SSH Co., Ltd., v. Shearson Lehman Bros., Inc.*, 678 F.Supp. 1055, 1059 (S.D.N.Y.1987). The statute does not, therefore, provide relief for acts or omissions in connection with trading in the secondary market.[7]

---

**3.** The dismissal of a Complaint or Counterclaim is treated as a dismissal for failure to state a claim upon which relief can be granted under Fed.R.Civ.P. 12(b)(6). *Seattle–First Nat. Bank v. Carlstedt*, 800 F.2d 1008, 1011 (10th Cir.1986).

**4.** In considering a Motion to Dismiss for failure to plead fraud with particularity, a district court must harmonize Rule 9(b) with the broader policy of notice pleading embodied in the Federal Rules. *Friedlander v. Nims*, 755 F.2d 810, 813 n. 3 (11th Cir.1985).

**5.** Rule 9(b) requires:
> that individual plaintiffs should identify particular defendants with whom they dealt directly ... that individual plaintiffs should designate the occasions on which affirmative statements were allegedly made to them—and by whom; and that the individual plaintiffs should designate what affirmative misstatements or half-truths were directed too them—and how.

*Seattle–First Nat. Bank,* 800 F.2d 1008, 1011, quoting *Trussell v. United Underwriters, Ltd.*, 228 F.Supp. 757, 774–75 (D.Colo.1964).

**6.** The Court hereby makes this determination with full knowledge of the recent holding by the Honorable Jose A. Gonzalez, Jr. in *Pugliese, et al., v. Phillips, Appel & Waden, Inc.,* Case No. 87–8588–CIV–GONZALEZ (S.D.Fla. May 9, 1988). In his Report and Recommendation, Magistrate Turnoff distinguishes at length *Pugliese* from the instant case. The Court refers the parties to the Magistrate's Report and Recommendation and adopts the reasoning therein.

**7.** The congressional purpose and intent underlying the Act of 1933, 15 U.S.C.A. Section 77a *et seq.,* is the regulation and distribution of securities. In contrast, the focus of the Securities Exchange Act of 1934 is on post-distribution trading of securities. Justice Marshall's opinion in *Herman & MacLean v. Huddleston,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) further explicates this matter:
> Section 11 of the 1933 Act allows purchasers of a registered security to sue certain enumerated parties in a registered offering when false or misleading information is included in a registration statement. The section was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering ... a Section 11 action must be brought by a purchaser of a registered security, must be based on misstatements or omissions in a registration statement, and can only be brought against certain parties ... *Id.,* 103 S.Ct. at 687.

■ The Defendants herein have failed to allege that they purchased securities in connection with a new offering, prospectus or registration. Precedent has established that an investor's claim in connection with securities traded on the secondary market, i.e., post-distribution trading, is not within the purview of Section 12(2) of the Securities Act. Accordingly, Plaintiff's Motion to Dismiss Count I of Defendants' Counterclaim is GRANTED on this basis.

### *Failure to State a Claim under Florida Statute Section 517.301*

Section 517.302(1)(a) of the Florida Securities Act, patterned after Rule 10b–5 of the federal securities laws, makes it unlawful for anyone

(1) To employ any device, scheme, or artifice to defraud;

\* \* \* \* \* \*

(3) To engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit upon a person.[8]

To state a cause of action under Section 517.301, a party must allege and prove: (1) a misrepresentation or omission of a material fact; (2) that the investor justifiably relied on said misrepresentation or omission; (3) that the misrepresentation or omission was made in connection with a purchase or sale of securities; (4) with scienter or reckless disregard as to the truth of the communication; and (5) that the untruth was the direct proximate cause of the investor's actual loss. *Currie v. Cayman Resources Corporation, et al.,* 835 F.2d 780, 785 (11th Cir.1988); *Gochnauer v. A.G. Edwards & Sons, Inc.,* 810

F.2d 1042, 1046 (11th Cir.1987) (stating that the elements of a cause of action under Fla.Stat. Section 517.301 are identical to those required by Section 10(b), except that the scienter requirement is relaxed in the former instance).

■ The Plaintiff has filed a Motion to Dismiss Count II of Defendants' Counterclaim for failure to state claim under Section 517.301. First, Plaintiff maintains that the Defendants have failed to state a claim under Section 517.301 as they have failed to plead a requisite element of the claim, loss causation, i.e., that the misrepresentation caused the economic harm.[9]

The Florida Supreme Court has recently held that proof of "loss causation" is not required in a securities proceeding instituted under Section 517.301 and Section 517.-211. *E.F. Hutton & Company v. Rousseff,* 537 So.2d 978 (Fla.Sup.Ct.1989). Due to this recent decision, this component of Plaintiff's Motion to Dismiss Count II of Defendants' Counterclaim is baseless. Accordingly, this Court finds in accordance with the Magistrate that the aforementioned motion should be DENIED.

■ Second, Plaintiff maintains that the Defendants have failed to allege that the alleged misrepresentation was made in "connection with" the actual purchase or sale of a security as required under Section 517.301. With respect to the "in connection with" component, it is evident to this Court that the Plaintiff's alleged misrepresentation was intended to induce the Defendants to continue trading securities through First Union. Accordingly, Plaintiff's Motion to Dismiss is DENIED on this basis.[10]

---

**8.** Like Rule 10b–5, the state provision only covers fraud "in connection with the offer, sale or purchase of a security." Fla.Stat. Section 517.-301(1)(a). Section 517.301(1)(a) differs from the parallel federal provision, however, in that a violation of the state statute requires proof of negligence rather than scienter.

**9.** The Fifth Circuit has defined "loss causation" as follows:

Causation is related to but distinct from reliance. Reliance is a cause *sine qua non,* a type of "but for" requirement: had the investor known the truth he would not have acted. Causation requires one step further in the analysis; even if the investor would not other-

wise have acted, was the misrepresented fact a proximate cause of the loss? The plaintiff must prove not only that, had he known the truth, he would not have acted, but in addition that the untruth was in some reasonably direct, or proximate way responsible for his loss.

*Huddleston v. Herman & MacLean,* 640 F.2d 534, 554 (5th Cir.1981), *rev'd on other grounds,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983).

**10.** The Court's ruling on this matter is in accord with the Report and Recommendation issued by the Magistrate.

Third, Plaintiff maintains that the Defendants' claim should be dismissed because the Plaintiff does not fall within the designated class of individuals which may be held liable for a Section 517.301 violation. Plaintiff maintains that the Florida legislature has expressly restricted the scope of liability under Section 517.301 to that narrow class of individuals and entities identified in Section 517.211, and as such, Plaintiff may not be held liable under the theory of vicarious liability.

■ Upon review of this matter, this Court finds in accordance with the Magistrate that Plaintiff's Motion to Dismiss Count II lacks merit. Contrary to Plaintiff's assertions, Fla.Stat. Section 517.211 expressly provides for liability premised upon the theory of agency.[11] As the Plaintiff indeed falls within the designated class of individuals which may be held liable for a Section 517.301 violation, it is the opinion of this Court that Plaintiff's Motion to Dismiss Count II should be DENIED.

### Failure to Allege Justifiable Reliance

A successful cause of action under Section 10(b) or Rule 10b–5 requires that the Plaintiff prove (1) a misstatement or omission (2) of a material fact (3) made with scienter (4) upon which the Plaintiff relied (5) that proximately caused the Plaintiff's loss. *Gochnauer, supra,* at 1046. The Florida statutory requirements are identical to Rule 10b–5, *Alna Capital Associates, et al., v. Wagner,* 758 F.2d 562, 565 (11th Cir.1985), except that the scienter re-

quirement under Florida law is satisfied by a showing of mere negligence. *Gochnauer, supra,* at 1046. It is undisputed that justifiable reliance is an element of statutory fraud and common law fraud. *Id.* at 1047; *Royal Typewriter Company v. Xerographic Supplies Corp.,* 719 F.2d 1092, 1103 (11th Cir.1983).

This Circuit requires "reasonable reliance" upon the material misrepresentation, a test of subjective reliance tempered by the requirement of "due diligence" on the part of the plaintiff. *Gochnauer, supra,* at 1047; *Huddleston, supra,* at 543. Not only must an individual actually rely on the information provided, this reliance must be "justifiable," i.e., with the exercise of reasonable diligence one still could not have discovered the truth behind the fraudulent omission or misrepresentation. *Gochnauer, supra,* at 1047; *Thompson v. Smith Barney, Harris Upham & Co., Inc.,* 709 F.2d 1413, 1417–18 (11th Cir.1983).

Plaintiff has filed a Motion to Dismiss Count II (Statutory Fraud) and Count III (Common Law Fraud) of Defendants' Counterclaim on the basis that the Defendants have failed to allege justifiable reliance.[12] After reviewing this matter, the Magistrate concluded that such a determination was premature, and that the district court should determine whether such reliance was justifiable after reviewing the evidence adduced at trial.[13]

■ Contrary to the recommendation of the Magistrate, this Court finds that a par-

11. Florida Statute Section 517.211(2) provides: Any person purchasing or selling a security in violation of s. 517.301, and every director, officer, partner, or agent of or for the purchaser or seller, if the director, officer, partner, or agent has personally participated or aided in making the sale or purchase, is jointly and severally liable to the person selling the security to or purchasing the security from such a person in an action for rescission, if the plaintiff still owns the security, or for damages, if the plaintiff has sold the security.

12. The essence of First Union's contention is that the Defendants have failed to demonstrate that their reliance was *reasonable,* given the fact that the purported representation that First Union would temporarily forego margin requirement rules is a clear violation of securities regulations. First Union concedes that the Defen-

dants have alleged reliance in Counts II and III of their Counterclaim; however, they have failed to allege that such reliance was "justifiable" or "reasonable."

13. Although the Magistrate held that justifiable reliance was an essential element of a cause of action for statutory and common law fraud, he held that the Defendants were not required to plead justifiable reliance in their Counterclaim. The Magistrate concluded, however, that Defendants must prove justifiable reliance at trial in order to prevail.

The Magistrate cites *Gochnauer, supra,* for this proposition: "after hearing the evidence, the court concluded that the Gochnauers did not rely upon the misrepresentations...." Based upon the foregoing statement in Gochnauer, the Magistrate concluded that justifiable reliance need not be pled, it need only be proved at trial.

ty must plead justifiable reliance in order to state a cause of action for statutory and common law fraud.[14] In this Court's view, a party must plead reliance upon a misrepresentation or omission, and in addition thereto, aver that such reliance was reasonable.[15] The reasonableness of reliance is distinct from the reliance itself. As the Defendants have failed to allege an essential element of their cause of action, the Court hereby dismisses Counts II and III of the Defendants' Counterclaim with leave to amend.

### Failure to State a Claim for Fraud as to Future Acts

To constitute actionable fraud, a false representation must relate to an existing or pre-existing fact. *Cavic v. Grand Bahama Development Company, Ltd.*, 701 F.2d 879, 883 (11th Cir.1983); *Sleight v. Sun and Surf Realty, Inc.*, 410 So.2d 998 (Fla. 3rd DCA 1982). A false statement amounting to a promise to do something in the future is not actionable fraud. *Royal Typewriter Co., supra,* at 1104.[16] Promises of future performance are not actionable even if the promise induces another to enter into a contract. *Royal Typewriter Co., supra,* at 1104; *Stoler v. Metropolitan Life Insurance Co.*, 287 So.2d 694, 695 (Fla. 3rd DCA 1974).

An exception to this general rule exists, however, when there are allegations that the misrepresentation was made with no present intent to carry it out in the future. *Royal Typewriter Co., supra,* at 1104. A plaintiff seeking to recover for such a misrepresentation must show that the promisor either lacked the intention to perform the promise or specifically intended not to perform at the time that the representation was made. *Id.*

Plaintiff has filed a Motion to Dismiss Count I (Federal Securities Fraud), Count II (State Securities Fraud), and Count III (Common Law Fraud) of the Defendants' Counterclaim on the ground that the alleged misrepresentation constitutes a promise as to future performance, and therefore, is not actionable.[17] Plaintiff further maintains that its Motion to Dismiss should be granted, as the Defendants have failed to allege that the Plaintiff either lacked the intention to perform the promise or specifically intended not to perform at the time that the representation was made. After reviewing this matter, the Magistrate concluded that the Defendants need not allege such an intent on the part of the Plaintiff; they need only prove such intent at the time of trial.

■ Contrary to the recommendation of the Magistrate, this Court finds that in order to successfully assert a Counterclaim against the Plaintiff, the Defendants must allege that the Plaintiff either lacked the intention to perform the promise or specifically intended not to perform at the time that the representation was made.[18] As stated in *Bernard Marko & Associates v.*

---

**14.** It is the view of this Court that the Magistrate's reliance upon *Gochnauer* is misplaced. The *Gochnauer* Court held that the Plaintiff had failed to *prove* reliance upon the alleged misrepresentation; thus, *Gochnauer* pertained only to proof at trial and not to the pleading requirements involved. The *Gochnauer* Court never addressed the pleading requirements necessary to successfully assert a cause of action, i.e., whether the Plaintiff had *alleged* that such reliance was justifiable.

**15.** "The courts have established that with regard to private recovery for the violation of Rule 10b–5, *a properly stated* cause of action must establish the scienter of the defendant, the materiality of any misrepresentation or omission by the defendant, the extent of actual reliance by the plaintiff on the defendant's statements, and the *justifiability of the reliance,* frequently translated into a requirement of due diligence by the plaintiff."
*Dupuy v. Dupuy,* 551 F.2d 1005 (5th Cir.1977). (emphasis provided).

**16.** A promise of future action or a prediction of future events cannot, standing alone, be a basis for fraud because it is not a representation, there is no right to rely on it, and it is not false when made. *Cavic, supra,* at 883.

**17.** The misrepresentation allegedly made by the Plaintiff was the Plaintiff's alleged promise not to enforce industry margin requirements *in the future.*

**18.** It is the view of this Court that *Royal Typewriter Co., supra,* does not support the Magistrate's conclusion that the Defendants need not plead that Plaintiff lacked the intent to perform. In *Royal Typewriter,* the Eleventh Circuit held that "[a]ppellees did not adduce sufficient evidence at the trial to show that this alleged misrepresentation was actionable." *Id.* at 1104. Thus, the aforementioned case dealt only with proof at trial and not with the pleading requirements involved.

*Steele,* 230 So.2d 42, 44 (Fla. 3rd DCA 1970), "*[i]n order to state a claim* for fraud based upon representation of a future occurrence, a plaintiff must *allege* that the representation was made without any intention of performing it, or made with the positive intention not to perform it * * *." (emphasis provided). Accordingly, Plaintiff's Motion to Dismiss Counts I, II, and III of the Defendants' Counterclaim is hereby GRANTED with leave to amend.

### Failure to Allege Breach of Fiduciary Duty

■ In Count IV of their Counterclaim, the Defendants have alleged that a fiduciary relationship existed between the Plaintiff and the Defendants, and that the Plaintiff acted contrary to its fiduciary duties of care and loyalty.[19] In response thereto, the Plaintiff has filed a Motion to Dismiss on the basis that the Defendants failed to allege facts sufficient to establish the existence of a fiduciary relationship.[20] After reviewing this matter, the Magistrate recommended that this Court deny the Plaintiff's Motion to Dismiss. For the reasons set forth below, this Court finds in accordance with the Magistrate, that Plaintiff's Motion to Dismiss should be denied.

The law is clear that a broker owes a fiduciary duty of care and loyalty to a securities investor. *Gochnauer, supra,* at 1049; *Thompson, supra,* at 1418; *Dupuy, supra,* at 1015. The fiduciary concept derives from trust and agency principles.

*Gochnauer, supra,* at 1049. Actions contrary to the duties of loyalty and care are remedied by giving the beneficiary of the relationship the right to recover for the fiduciary's breach. *Id.* Florida courts recognize a breach of fiduciary duty claim at common law. *Id.*

The fiduciary duty which is owed by the broker to the securities investor turns upon the nature of the account. Different fiduciary duties are owed based on whether the account is discretionary or nondiscretionary. *Id.; Leib v. Merrill Lynch, Pierce, Fenner and Smith,* 461 F.Supp. 951 (E.D. Mich.1978).[21]

Fiduciary duties associated with a nondiscretionary account, such as the one presently at issue, include the following:

(1) the duty to recommend [investments] only after studying it sufficiently to become informed as to its nature, price, and financial prognosis; (2) the duty to perform the customer's orders promptly in a manner best suited to serve the customer's interests; (3) the duty to inform the customer of the risks involved in purchasing or selling a particular security; (4) the duty to refrain from self-dealing ...; (5) the duty not to misrepresent any material fact to the transaction; and (6) the duty to transact business only after receiving approval from the customer.

*Gochnauer, supra,* at 1049.[22]

Upon review of Count IV of the Defendant's Counterclaim, the Court finds that

**19.** The Defendants have alleged that the Plaintiff breached the following fiduciary duties: (1) the duty to perform the customer's orders promptly in a manner best suited to the customer's interests; (2) the duty to inform the customer of the risks involved in purchasing or selling a particular security; and (3) the duty not to misrepresent any material fact to the transaction. The Defendants have made the foregoing allegations based upon the Plaintiff's alleged failure to provide timely, accurate data reflecting the true condition of the account, or alternatively, upon Plaintiff's alleged failure to provide the Defendants with additional time within which to satisfy the margin requirements as allegedly promised by Mr. Parillo.

**20.** Plaintiff maintains that in order to establish the existence of a fiduciary duty, a party must allege that a broker maintained discretion over the customer's account, or that a special advisory relationship existed. Plaintiff further maintains that the Defendants have failed to allege either of the foregoing indicia of a fiduciary duty.

**21.** The discretionary account is defined as an account where the broker has a continuous obligation to manage the account; a nondiscretionary account is defined as an account where the customer and broker confer as to a particular transaction but the broker has no continuing management duty over the account once the single transaction is complete. *Gochnauer, supra,* at 1049.

**22.** Neither party herein disputes the fact that this case involves a nondiscretionary account. Plaintiff contends that where the account is nondiscretionary, no fiduciary duties arise. Plaintiff's contention, however, is contrary to the law of this circuit. *See Gochnauer, supra,* at 1049.

the Defendants have stated a claim for breach of fiduciary duty. Accordingly, Plaintiff's Motion to Dismiss Count IV is DENIED.

### Failure to State a Cause of Action for Breach of Contract

Count VI of the Defendants Counterclaim purports to state a cause of action for breach of contract. The Plaintiff has filed a Motion to Dismiss Count VI of the Defendants' Counterclaim on the ground that this claim is directly at odds with the express language of the contract at issue.[23] In opposition thereto, the Defendants maintain that Count VI is facially sufficient.[24]

Upon review of this matter, it is clear that the scope of the argument herein exceeds the four corners of the contract. As such, this matter is more properly resolved via summary judgment, rather than a Motion to Dismiss.[25]

### Motion for More Definite Statement as to Alleged Violations of Florida Statute Section 517.12 in Count VII

Count VII of the Defendants' Counterclaim broadly alleges that unregistered employees of First Union executed transactions initiated by the Defendants from August 1987 through October 1987.[26] As Count VII refers to such a broad time frame and alleges that these transactions were made through "unregistered persons," the Plaintiff is entitled to a more definite statement. Specifically, the Defendants must allege, to the extent possible, the nature of the transactions and the identities of the unregistered salesmen involved. At that point, the Plaintiff will be properly equipped to frame an appropriate response.

### Conclusion

Upon review of the Magistrate's Report and Recommendation, the objections thereto, and the record herein, it is hereby

ORDERED AND ADJUDGED as follows:

1. Motion to Dismiss Counterclaim for Failure to Plead Fraud with Particularity —DENIED;

2. Motion to Dismiss Counterclaim for Failure to State a Cause of Action under Section 12(2)—GRANTED as to Count I of the Counterclaim;

3. Motion to Dismiss Counterclaim for Failure to State a Claim under Fla.Stat. Section 517.301—DENIED;

4. Motion to Dismiss Counterclaim for Failure to Allege Justifiable Reliance— GRANTED with leave to amend;

5. Motion to Dismiss Counterclaim for Failure to State a Claim for Fraud as to Future Acts—GRANTED with leave to amend;

6. Motion to Dismiss Counterclaim for Failure to Allege Breach of Fiduciary Duty—DENIED;

7. Motion to Dismiss Counterclaim for Failure to State a Cause of Action for Breach of Contract—DENIED;

---

**23.** In support of its Motion to Dismiss, the Plaintiff maintains that the express language of the contract authorized the Plaintiff to liquidate the Defendants' account as necessary when margin calls were generated. Thus, Plaintiff contends that the liquidation of the Defendants' account was done in accordance with the express terms of the contract. Moreover, Plaintiff maintains that the Defendants' assertion that First Union agreed not to enforce the margin requirement direct contradicts the express terms of the contract.

**24.** The Defendants maintain that Count VI states a cause of action "as it describes a course of conduct and agreement between the parties, requiring that First Union provide up to date, accurate financial information concerning the status and condition of the Milos account.

Such agreement and conduct is not inconsistent with any written agreement entered into between the parties." *See Motion in Opposition to Motion to Dismiss Counterclaim.*

**25.** Whether the course of dealing between the parties and the alleged agreements that followed constitute an enforceable modification of the contract is more properly resolved by way of a summary judgment.

**26.** Specifically, Count VII alleges that "[d]uring the entire period of trading in the Milos account and in particular, during the months of August, September and October, 1987, the Defendant initiated transactions and made changes in transactions through persons who were not registered as securities salesmen...." *See Defendants' Counterclaim, p. 16.*

8. Motion for More Definite Statement as to Count VII—GRANTED.

DONE AND ORDERED.

**FLORIDA FUELS, INC., Plaintiff,**

v.

**BELCHER OIL COMPANY, Defendant.**

**No. 87–1025–CIV.**

United States District Court,
S.D. Florida.

June 29, 1989.

John Mariani, Cadwalader, Wickersham & Taft, Palm Beach, Fla., for plaintiff.

Thomas McDade & William Pakalka, Fulbright & Jaworski, Houston, Tex., Richard Williams, Tew Jorden Schulte & Beasley, Miami, Fla., for defendant.

## MEMORANDUM ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

RYSKAMP, District Judge.

THIS CAUSE is before the court upon defendant's motion for partial summary judgment filed March 21, 1989. Defendant contends that, as a matter of law, plaintiff cannot prevail on its claim that it was denied access to an essential facility in violation of section 2 of the Sherman Act. 15 U.S.C. § 2.

### I. Undisputed Facts

This suit arises out of Florida Fuels' attempt to compete in the market for providing heavy marine fuel oil to South Florida's cruise ship and cargo fleets. Historically, South Florida was not a major shipping port. But, in the mid-seventies, the cruise ship industry began to expand, as cruise line operators took advantage of South Florida's proximity to Caribbean ports of call. Today, the Port of Miami is the largest cruise ship port in the world and Port Everglades, in Fort Lauderdale, is close behind. These two ports and Port Canaveral, near Cocoa Beach, account for nearly two-thirds of all U.S. cruise ship passenger boardings. The cargo shipping sector has also grown, due to extensive trade with the nations of the Caribbean and South America.

Because of operational constraints and a lack of economical facilities elsewhere in the Caribbean, these ships obtain nearly all of their heavy marine fuel oil (also referred to as "bunkers") at their home ports in South Florida. Bunkers are available in different grades and types, but all consist primarily of a blend of No. 6 oil, or dirty oil, and No. 2 oil, a lighter, better refined and more expensive oil. The quality of the base No. 6 oil, the blending, and the delivery temperature all affect the ultimate quality of the product and the functioning of the ship's engines. Ship owners purchase their bunkers in bulk because of the large quantities of fuel consumed. The cruise ships' schedules require a supplier to fuel many ships within a limited period of time. Late deliveries will delay the ships' departure and ultimately cost the cruise line money.

### A. *Belcher Oil Co.*

Defendant Belcher Oil Co. ("Belcher") is based in Miami, marketing a wide range of petroleum products. In Miami, Belcher has a storage tank facility consisting of 15 tanks, located on Fisher Island, near the Port of Miami. Generally, Belcher blends its fuel on the island and then barges the fuel across the channel to service the ships while at berth. Land around the Port is extremely limited and the Port Director has indicated there are no plans for allowing any storage tanks on in the Port property itself. In Fort Lauderdale, Belcher has 30 tanks on 46.5 acres of land in Port Everglades and a system of pipelines servicing all the berths. The fuel is blended and then piped directly to the ships in their berths. Few deliveries are made by barge in Port Everglades. The parties have not presented evidence regarding Belcher's facilities in Port Canaveral, but it appears there are storage tanks there also. The major oil companies have pulled out of the South Florida marine fuel market, leaving Belcher with a monopoly on the supply of bunkers in Port Everglades and the Port of Miami from the mid-seventies until late 1984.

### B. *Florida Fuels*

Plaintiff Florida Fuels, Inc. is also headquartered in Miami and provides bunkers to cruise ships in South Florida. Dissatisfied by Belcher's high prices and lackluster service, sectors of the cruise ship industry encouraged the principals of Bahamas Fuels to form a new company, Florida Fuels, to provide competition by selling bunkers. The original plan was to purchase heavy oil and No. 2 oil from a Chevron refinery in Freeport, ship it to South Florida, and fuel the cruise liners directly from special barges, blending the fuel in-line as it was pumped into the vessel. Florida Fuels entered into "requirements" contracts with a number of cruise lines to provide bunkers for certain ships for a year at a pricing formula based on market rates. Florida Fuels hoped to finesse the need for land-based storage with its tanker-barges, passing on savings from price changes quicker and providing a better quality product. Florida Fuels made substantial inroads in terms of total bunker sales made in each port, as shown below, but the vast majority of sales have been under contract.

| | Port of Miami | | Port Everglades | | Port Canaveral | |
|---|---|---|---|---|---|---|
| | Belcher | FF | Belcher | FF | Belcher | FF |
| 1984 | 99% | 1% | 100% | 0% | 100% | 0% |
| 1985 | 63% | 37% | 88% | 12% | 100% | 0% |
| 1986 | 55% | 45% | 85% | 15% | 95% | 5% |
| 1987 | 64% | 36% | 96% | 4% | 97% | 3% |

There is limited space available in the Port of Miami area and the port director has indicated there are no plans to allow fuel storage tanks on the Port property, but plaintiff has never formally proposed to lease or purchase land from the port or to lease space from Belcher. Florida Fuels did suggest the possibility of leasing tank space, but Belcher denied the request because of a lack of capacity. No financial

terms were proposed or discussed. In Port Everglades, a number of oil companies own fuel storage tanks near the Belcher property and there is land available for constructing additional tanks, but Belcher controls the pipeline leading to the berths. Florida Fuels never formally proposed to lease tank space in Port Everglades from Belcher or any oil company and did not request access to Belcher's pipelines. Most of the tankage in Port Everglades is dedicated to clean oil, unsuitable for the storage of dirty oil. Florida Fuels was offered an opportunity by Port Everglades to participate in an expansion of the pipeline system to newly constructed berths, but declined, claiming it had no access to storage tanks.

During the course of this litigation, Florida Fuels prepared a study which determined it was not economically feasible to construct its own tanks, terminal, and pipelines in Port Everglades. The study estimated that construction of the necessary facilities would require a capital investment of 10–11 million dollars and assumed that Florida Fuels would not invest unless it would receive an internal rate of return of at least 15%. Given recent bunker price levels and current bunker demand in South Florida of 400,000 barrels per month with annual 5% increases, the study determined that to realize its desired return of 15%, Florida Fuels would have to sell its bunkers in South Florida at a price of $2.64/bbl to $3.53/bbl above the Platt's U.S. Gulf low.

Florida Fuels contends that Belcher's storage tanks on Fisher Island and its tanks and pipeline system at Port Everglades are essential to competing in the relevant market. Belcher has conceded, for purposes of this motion, that the relevant market is the South Florida bunker market. Since Florida Fuels is apparently not seeking access to Belcher's Port Canaveral facilities and has presented no evidence regarding these facilities, Belcher's

Port Canaveral property will not be considered in this analysis.

## II. Summary judgment standard

■ Defendant has moved for partial summary judgment on the essential facilities issue, contending there are no undisputed material facts. The court must grant judgment if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P.* 56(c). Defendant will be entitled to summary judgment unless plaintiff has made a showing sufficient to establish the existence of all the elements necessary to its monopoly claim based on the essential facilities doctrine. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A complete failure of proof concerning a necessary element of the nonmoving party's case renders all other facts immaterial. *Id.,* 477 U.S. at 323, 106 S.Ct. at 2552–53.

■ Further, the Supreme Court's recent pronouncements make clear that, in an antitrust claim, a plaintiff must present evidence that tends to exclude the possibility that defendant's conduct was as consistent with permissible competition as with illegal conduct. *Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). Summary judgment will be granted if, considering the factual context, the antitrust claim is implausible or makes no economic sense. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). These standards are not limited to antitrust conspiracy actions. *McGahee v. Northern Propane Gas Co.,* 858 F.2d 1487 (11th Cir. 1988). If necessary, defendant must present a valid business justification for denying access to the facility, as an affirmative defense.* Defendant has directed the

---

* Defendant contends that plaintiff has the burden of proving an absence of valid business reasons for refusing to deal and must present evidence that tends to exclude the possibility that the defendant's conduct was as consistent with competition as with illegal conduct. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The *Matsushita* case involved allegations of an antitrust conspiracy and did not involve a unilateral refusal to deal as in this case. The court's reliance on defendant's failure to establish valid business reasons for refusing to deal with plaintiff in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 600–01, 105

court to numerous cases in which various courts have granted summary judgment for failure to show that plaintiff was denied access to an essential facility.

## III. Legal analysis

### A. *The Sherman Act*

 The Sherman Act prohibits anti-competitive behavior. 15 U.S.C. § 1 *et seq.* Section 2 makes attempts to monopolize illegal. Although the mere existence of monopoly power does not imply a violation of the Act, the use of monopoly power, no matter how lawfully acquired, to foreclose competition, to generate a competitive advantage, or to destroy a competitor, is unlawful. *United States v. Griffith*, 334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948). There is no general duty to deal, and in the absence of any purpose to create or maintain a monopoly, a corporation may freely exercise its discretion to conduct business with whomever it wants. *United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 600-01, 105 S.Ct. 2847, 2856-57, 86 L.Ed.2d 467 (1985).

### B. *The essential facilities doctrine*

 But a refusal to deal where a competitor is denied reasonable access to an essential facility is anti-competitive behavior sufficient to support a section 2 claim. *MCI Communications Corp. v. American Telephone and Telegraph Co.*, 708 F.2d 1081 (7th Cir.1983), *cert. denied* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983). The essential facilities doctrine or "bottleneck" theory derives from the Supreme Court's decision in *United States v. Terminal Railroad*, 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912). In that case, the court determined that competitors should be allowed access to a railroad terminal in St. Louis because it was essential to their ability to compete. *Id.*, 224 U.S. at 386-90, 32 S.Ct. at 507-08. The terminal was the only feasible station for traffic from the west and was controlled by a group of railroads who refused to allow access to others. This doctrine has been applied in a variety of contexts, requiring access to a football stadium, to newspaper advertising, and to a market building. For a discussion of these and other decisions imposing a duty to deal, see the opinion of Judge Marcus in *Consolidated Gas Co. of Fla. v. City Gas Co. of Fla.*, 665 F.Supp. 1493, 1533 (S.D.Fla.1987). The essential facilities doctrine was formalized in *MCI*, 708 F.2d at 1132-33. The four elements necessary to establish liability are:

(1) control of the essential facility by a monopolist;

(2) a competitor's inability, practically or reasonably, to duplicate the essential facility;

(3) the denial of the use of the facility to a competitor; and

(4) the feasibility of providing the facility.

*MCI,* 708 F.2d at 1132-33. Of course, the essential facilities doctrine and other cases holding monopolists liable for refusing to deal only qualify the general rule that there is no duty to help competitors. *Olympia Equipment Leasing v. Western Union Telegraph*, 797 F.2d 370, 376 (7th Cir.1986).

#### 1. Control of facility by monopolist

 Under this doctrine, a monopolist may not foreclose use of the scarce facility, but must share on fair terms. Monopoly power may be defined as the power to control prices or to exclude competition. *United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956). In determining whether an entity is a monopolist, a court may consider various factors including control over price, the ability to exclude competition, a market share of greater than 70-80%, and high barriers to market entry. *Consolidated Gas*, 665 F.Supp. at 1519-21. Courts have first defined the relevant geographic and product market and then computed market share from this data. *Id.* at 1519. Although monopoly power is an issue of fact, *Olympia Equipment*, 797 F.2d

S.Ct. 2847, 2856-57, 86 L.Ed.2d 467 (1985), suggest that, if plaintiff has shown that shared use is feasible, then the burden shifts to the defendant to present its valid business reasons for refusing to allow the plaintiff access to the essential facility.