**FIRST UNION DISCOUNT BROKER-AGE SERVICES, INC.,**
Plaintiff/Counterdefendant,

v.

**Nick P. MILOS and Catherine P. Milos,**
Defendants/Counterplaintiffs.

No. 87–6981–EPS.

United States District Court,
S.D. Florida.

Aug. 13, 1990.

As Modified Aug. 10, 1990.

Birgitta K. Siegel, Ruden, Barnett, McClosky, Smith, Schuster & Russell, P.A., Miami, Fla., for plaintiff/counterdefendant First Union Discount Brokerage Services, Inc.

Yueh–Mei Kim Nutter, Lerner & Pearce, P.A., Fort Lauderdale, Fla., for defendants/counterplaintiffs Nick P. Milos and Catherine P. Milos.

## ORDER GRANTING PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT ON ITS COMPLAINT AND DEFENDANTS' AMENDED COUNTERCLAIM

SPELLMAN, District Judge.

THIS CAUSE comes before the Court upon Plaintiff First Union Discount Brokerage Services, Inc.'s [hereinafter "First Union"] motions for summary judgment on its Complaint and Nick and Catherine Milos' [hereinafter "the Milos'"] Amended Counterclaim filed with this Court on June 20, 1990. Upon careful review of the record, and for the reasons set forth below, this Court shall grant First Union's motions for summary judgment on its Complaint and the Milos' Amended Counterclaim.

## I. JURISDICTION

This is an action between citizens of different States. First Union is a North Carolina corporation with its principal place of business in the State of North Carolina. The Milos' are citizens of the State of Florida and reside in Broward County, Florida. The matter in controversy exceeds the sum of $50,000.00, exclusive of interest and costs. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1).

## II. BACKGROUND

In February of 1984, the Milos' opened a non-discretionary securities account (bearing account number 7TK–041101) with Dis–Com Securities, Inc. First Union acquired Dis–Com Securities later that year. The Milos' maintained this account with First Union during all material times.

First Union is a discount broker. As such, it accepts orders from customers for the purchase and sale of securities. However, by not providing the range of services which so-called "full service" firms provide (i.e., assigned broker(s), research and financial or investment advice), First Union is able to charge its customers substantially reduced commissions.

First Union is also what is known as an introducing broker. As such, First Union is not a member of the pertinent securities exchanges, and is required to contract a clearing broker which is a member of such exchanges, and which can execute customer orders on the floors of the exchanges. Through the early part of October, 1987, First Union's clearing broker was Cowan & Co. [hereinafter "Cowan"], which was a member of the New York Stock Exchange, the American Stock Exchange, and the Chicago Board of Options Exchange. On October 5, 1987, Pershing & Co. [hereinafter "Pershing"] succeeded Cowan as First Union's clearing broker for said exchanges. Cowan, and thereafter Pershing, entered the Milos' orders for the purchase and sale of securities on the floors of the exchanges.

Pursuant to industry rules, Cowan and Pershing were required to obtain contracts from First Union's margin customers setting forth the rights and obligations of the parties in connection with the clearing firm's loan of monies to customers trading on margins.[1] The Milos' executed a Customer's Agreement with Cowan on March 1, 1984.[2] Thereafter, on September 22, 1987, the Milos' executed a Margin Agreement[3] and Option Agreement[4] in anticipation of Pershing succeeding Cowan as First Union's clearing broker. These written contracts which the Milos' executed with First Union and the respective clearing broker provided that the Milos' were to meet margin calls on demand and pay any deficiency balance. The Margin agreement which the Milos' executed with First Union and Pershing expressly permits the liquidation of the Milos' account at any time by, and in the sole discretion of, either First Union or Pershing, with or without notice or demand for additional margin. The Milos' dispute that these contracts comprise the entire agreement between the parties.

Cowan and Pershing, rather than First Union, monitored daily margin requirements in the Milos' account during the respective time periods. Similarly, monies the Milos' borrowed for margin transactions in their First Union account were loaned to them by the respective clearing brokers at the time. The Milos' allege, however, that they did not know who loaned them these monies.

Cowan and Pershing, but not First Union, maintained computer databases which generated printouts or resumes ("Omniline" printouts) reflecting the Milos' daily transactions, account positions, and other financial information relative to their account. To the extent that such printouts were made available to First Union, it would provide the same to the Milos' upon request.

The Milos' traded options in their account at First Union. Specifically, the Milos' engaged in the writing, otherwise known as "short selling", of put options. A short put option is an option sold to another for a premium, whereby the purchaser can require the seller to purchase certain securities at a specific price for a specific period of time. If the market price of that specif-

---

**1.** *E.g., Schenck v. Bear, Stearns & Co.,* 484 F.Supp. 937 (S.D.N.Y.1979).

**2.** Exhibit 1 to the Milos' Memorandum in Opposition to First Union's Motion for Summary Judgment on its Complaint [hereinafter "the Milos' Memorandum"].

**3.** Exhibit 2 to the Milos' Memorandum.

**4.** Exhibit "F" to First Union's Motion for Summary Judgment on its Complaint.

ic security falls, the seller faces the risk that he or she could either be required to purchase the security at a price in excess of the market price, or "cover" the short position by purchasing identical option contracts in the open market at a cost in excess of the premium received on the original sale of the option, in either event sustaining a loss.

Between October 8 and 14, 1987, Pershing issued house maintenance calls on the Milos' account at First Union. House calls are issued by clearing brokers to enforce margin requirements slightly above that required by the exchanges. The Milos' were vacationing in the Soviet Union at the time, and allegedly did not receive any telegraphic or other wire notice regarding margin problems in their account.[5]

The Milos' returned from their vacation on October 14, 1987. Thereafter, on Friday, October 16, the Milos' received a computer printout showing their positions as of the close of business the evening before. That same day, or the coming Monday, October 19, Barry Parillo, First Union's Fort Lauderdale Branch Manager, apprised the Milos' that he had received house maintenance calls issued by Pershing to enforce margin requirements, but that according to the computer printout for their account, the equity of the account was seventy-six percent. The Milos' allege that Parillo had previously told them that as long as the equity was greater than thirty-five percent, there would be no margin call on their account.[6] While Parillo assured the Milos' that the equity information contained in the printout was correct and that the margin calls were incorrect, Parillo stated that he would nevertheless verify this and get back to the Milos' later that day.[7] The Milos' allege that neither Parillo nor any other employee or agent of First Union confirmed with them later whether the call

was correct, nor ask the Milos' to deposit additional equity into their account. The Milos' further allege that the equity information contained in the printout was grossly inaccurate in that it overstated their account equity by more than $600,000.[8]

Between that Friday, and the coming Monday, October 19, 1987, the stock market as measured by the Dow Jones Industrial Average, experienced an unprecedented drop in excess of 600 points. As a consequence of the stock market "crash," and the positions in the Milos' account at First Union, particularly the short put options, the New York Stock Exchange generated margin calls in the Milos' account during the week of October 19, 1987. These calls required either the deposit of cash or other collateral to maintain minimum equity requirements, or the liquidation of the Milos' account.

On Monday, October 19, 1987, Parillo advised the Milos' that Robert Flowers, President of First Union, wanted to meet with them the following day in anticipation of even larger calls to occur after the close of business that day. The appointment was agreed to by the Milos', though they allege that Parillo did not disclose the purpose of the meeting.[9] On the morning of October 20, 1987, Flowers notified the Milos' of the New York Stock Exchange's calls exceeding $1.2 million in their account which had to be met immediately.

The Milos' failed to post additional cash or other collateral to meet the New York Stock Exchange's or Pershing's calls. Consequently, beginning on Tuesday or Wednesday, October 20 or 21, 1987, and over the course of the next three to four days, short put positions in the Milos' account were closed (i.e., puts which had been previously sold short were repurchased). The Milos' account was ultimately left with

---

**5.** Deposition of Saverino Ierano, pp. 56–57, Exhibit 6 to the Milos' Memorandum.

**6.** May 17, 1990 Deposition of Nick Milos, p. 13, Exhibit 7 to the Milos' Memorandum.

**7.** *Id.* at 72; November 30, 1989 Deposition of Nick Milos, pp. 94, 98, Exhibit 3 to the Milos' Memorandum.

**8.** June 29, 1990 Affidavit of Henry C. Murfey, Jr., Exhibit 11 to the Milos' Memorandum.

**9.** May 17, 1990 Deposition of Nick Milos, p. 292, Exhibit 7 to the Milos' Memorandum.

a deficiency balance of $265,500.49 [10]. When, after demand, the Milos' failed to pay this deficiency, First Union paid Pershing the sum of $255,093.04.[11] First Union alleges that it has become subrogated to Pershing's rights against the Milos' to collect this debit balance. The Milos' dispute this, and argue that First Union has failed to plead equitable subrogation.

## III. STANDARD FOR MOTIONS FOR SUMMARY JUDGMENT

■ Rule 56(c), Federal Rules of Civil Procedure, provides that summary judgment shall be rendered if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to material fact and that the moving party is entitled to judgment as a matter of law." The moving party bears the initial burden of informing the Court of the basis of its motion, and identifying those portions of the pleadings and evidence which it believes demonstrates the absence of material fact so as to warrant entry of summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). When the moving party has carried its burden, the burden then shifts to the non-moving party to "do more than simply show that there is some metaphysical doubt as to material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), and to present "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

Summary judgment is mandated against a party who, after adequate time for discovery and upon motion, "fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552. This standard extends to affirmative defenses. *Thorsteinsson v. M/V Drangur*, 891 F.2d 1547, 1550–51 (11th Cir.1990).

■■ In ruling on a motion for summary judgment, it is the Court's obligation to review the facts in the light most favorable to the non-moving party and to allow such party the benefit of all reasonable inferences to be drawn from the evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). If there is no genuine issue of material fact, summary judgment is proper because it avoids needless and costly litigation and promotes judicial efficiency. *Trustees of the Plumbers Local No. 519 Health and Welfare Trust Fund v. Garcia*, 677 F.Supp. 1554, 1556 (S.D.Fla.1988). However, summary judgment is an extreme remedy which should not be granted unless the moving party has established the right to judgment beyond controversy.

## IV. DISCUSSION

### A. Motion for Summary Judgment on Complaint

First Union asserts claims for: account stated (Count I); open account (Count II); and breach of contract (Count III). The Milos' assert as affirmative defenses that First Union: (i) proximately caused the losses in their account by failing to fulfill certain implied and express contractual obligations; (ii) proximately caused the losses

---

**10.** The Complaint alleges that as of October 30, 1987, the Milos' owed First Union $265,500.49. However, after service of the Complaint, First Union's counsel was advised that this amount was reduced in November, 1987 by liquidation of securities the Milos' maintained in another First Union account, and to which the Milos' did not object. First Union consequently reduced the amount allegedly owed by the Milos' to $255,093.04. *See* June 11, 1990 Affidavit of Robert Flowers, Exhibit "G" to First Union's Motion for Summary Judgment on its Complaint.

**11.** *Id.* at 2. Subsequent to the time that the undersigned issued this Memorandum Opinion, Plaintiff moved this Court to amend the findings in the instant case to include an additional $10,375.61. This Court found Defendants responsible for said amount and, consequently, granted Plaintiff's Motion. In addition, this Court granted Plaintiff's Motion to Tax Costs and for Attorney's Fees.

in their account by dominating and usurping the account; (iii) fraudulently induced them to maintain a debit balance; (iv) failed to mitigate its losses; and (v) breached its fiduciary duty to them by carelessly liquidating their account. First Union seeks summary judgment on all counts of its Complaint.

### 1. Account Stated and Open Account—Counts I and II

■ To prevail on a claim for account stated or open account,[12] First Union must prove that there was an implicit promise by the Milos' to pay a sum certain of which the Milos' were informed. In November, 1987, First Union delivered to the Milos' their Statement of Account for the period of September 26, 1987 through October 30, 1987. The first page of the Statement reflects a debit balance of $265,500.49 which arose in the Milos' account. First Union asserts that regardless of whether the Milos' objected to the liquidation of their account, the undisputed fact remains that the Milos' failed to specifically object to the debit balance reflected in their October, 1987 Statement of Account. According to First Union, the first mention of any objection to the debit balance was by way of answer in this action served approximately seven months after the Statement of Account was rendered. First Union argues that the Milos' failure to object to the Statement of Account gives rise to a presumption as to the correctness of the debit. *Dudas v. Dade County*, 385 So.2d 1144, 1144 (Fla. 3d DCA 1980); *Breezy Bay, Inc. v. Industria Maquiladora Mexicana S.A.*, 361 So.2d 440, 441 (Fla. 3d DCA 1978). First Union further argues that the Milos' cannot demonstrate a mistake as to the amount of the debit or a claim for fraud necessary to rebut this presumption.

Nick Milos testified that he orally objected to First Union's liquidation of their account. In an effort to prevent further losses, Robert Flowers began liquidating the Milos' account during the week of October 19, 1987 by selling securities and closing short put option positions which had been in the account. Nick Milos contested Flower's authority for what he was doing,[13] and refused to initial order tickets Parillo presented to him.[14]

Nick Milos asserts that on October 19, he advised Flowers that Parillo had given them through November 15, 1987 to meet margin calls or cure other deficiencies in their account, and that he expected First Union to abide by the agreement. Flowers responded that Parillo had no authority to make such an agreement, whereupon Nick Milos informed Flowers that they assumed Parillo had the authority to waive or excuse any margin regulations since he was a branch office manager.[15]

Initially, this Court finds as misleading First Union's assertion that the Milos' first objected to the Statement of Account by way of answer seven months after the Statement was rendered. A review of the record reveals that First Union did not serve the Milos' with its Complaint until January, 1988, some two and one-half months after the liquidation. Due to pretrial motions and by agreement of counsel, the Milos' had through May 17, 1988 within which to serve their Answer.

Secondly, this Court holds that whether the Milos' objected verbally to the liquidation of their account prior to the rendition of the Statement of Account is irrelevant to the claims for account stated or open account. The reverse side of each page of the Statement of Account provides in bold print:

> This statement will be deemed an account stated unless you advise us in *writing* of any objection to it within ten (10) days after receipt. Any such objection should be sent to FIRST UNION BROKERAGE SERVICES, INC., at the address on the front of the statement. (emphasis added).

12. Courts frequently treat claims for open account and account stated as substantially synonymous. 1 Am.Jur.2d *Accounts and Accounting* § 4 (1962).

13. November 30, 1989 Deposition of Nick Milos, p. 122, Exhibit 3 to the Milos' Memorandum.

14. *Id.* at 126.

15. *Id.* at 116, 141.

Upon review of the record, this Court finds there to be no genuine issue of material fact that the Milos' failed to object in writing, or otherwise, to the debit balance reflected in their October, 1987 Statement of Account.

■ Thirdly, with regards to First Union's contention that the Milos' failure to object to the Statement of Account gave rise to a presumption of correctness of the debit balance, it is well established that the presumption of correctness of items contained in an account stated and of liability of a party for those items may be overcome by proof of fraud, mistake, or error. *Home Health Servs. of Sarasota, Inc. v. McQuay–Garrett, Sullivan & Co.*, 462 So.2d 605, 606 (Fla. 2d DCA 1985). However, as more fully set forth below in this Court's discussion of the Milos' Amended Counterclaim, this Court finds that there is no genuine issue of material fact that First Union is not liable for common law fraud (Count II of Amended Counterclaim). Accordingly, this Court similarly finds that there is no genuine issue of material fact that the Milos' failure to object to the debit balance giving rise to a presumption of the correctness of the debit balance and the Milos' liability for the same was not overcome by proof of fraud on the part of First Union.

■ Finally, this Court dismisses as untimely the Milos' argument that First Union failed to plead or otherwise proffer evidence of assignment or equitable subrogation to the rights of Pershing to collect the debit balance from the Milos'. In their Memorandum in Opposition to First Union's Motion for Summary Judgment, the Milos' raise this argument for the first time. This Court holds that if the Milos' had any genuine question whether First Union was the real party in interest entitled to bring this action, it was their obligation to raise such question promptly. *See* Fed.R.Civ.P. 17(a); *McLouth Steel Corp. v. Mesta Mach. Co.*, 116 F.Supp. 689,

691 (E.D.Pa.1953), *aff'd*, 214 F.2d 608 (3d Cir.1954). In failing to do so, they are now precluded from raising this issue in opposition to First Union's Motion for Summary Judgment.

■ However, assuming *arguendo* that the Milos' may now raise this issue, this Court finds that there is no genuine issue of material fact that First Union became subrogated to Pershing's right to sue and collect damages under the Margin Agreement executed by the parties. While it is undisputed that Pershing, rather than First Union, loaned the Milos' money to trade on margin, the uncontroverted evidence reflects that First Union paid to Pershing the resulting debit balance in the Milos' account. On October 3, 1989, Robert Flowers testified that First Union paid Pershing the amounts due on the Milos' account.[16] Additionally, the Milos' Statement of Account for the period of October 31 through November 27, 1987, reflects that the Milos' debt was journaled out of the Milos' margin account and into First Union's account for collection.[17]

### 2. Breach of Contract—Count III

■ First Union claims that the Milos' breached their Margin Agreement.[18] Pursuant to the express language of paragraphs five, six and seven of the Agreement, First Union or Pershing is entitled to liquidate the Milos' account, at their own discretion, and without prior notice or demand for additional margin. The Agreement further requires the Milos' to pay upon request any deficiency balance resulting from liquidation of positions, and any resulting debit balance, regardless of whether a margin call issued. First Union alleges that the Milos did not timely object to the debit balance, and breached the Agreement by failing or refusing to: deposit money or other collateral to satisfy margin calls generated in their account; honor option contracts written in their account; and honor demands to pay the re-

---

**16.** October 3, 1989 Deposition of Robert Flowers, p. 86, Exhibit "B" to First Union's Reply Memorandum in support of its Motion for Summary Judgment on its Complaint.

**17.** Exhibit "D" to First Union's Reply Memorandum in support of its Motion for Summary Judgment on its Complaint.

**18.** Exhibit 2 to the Milos' Memorandum.

sulting debit balance after positions in their account were liquidated.

The Milos' defend against First Union's claim for breach of contract, and counterclaim for the same, on the grounds that First Union allegedly breached its oral agreement not to enforce margin calls until November 15, 1987. The Milos' allege that as a result of First Union substituting Pershing for Cowan as its clearing broker, First Union experienced problems in providing them with timely and accurate computer printouts on the financial status of their account. The Milos' further allege that they approached Parillo towards the end of September, 1987, regarding First Union's alleged failure to supply them with the computer printouts. According to the Milos', the availability of these printouts was particularly important because they were intending to leave on vacation for the Soviet Union on September 28, 1987.

The Milos' allege that on approximately September 15, 1987, Parillo promised them additional time until November 15, 1987 to meet any margin calls or cure other deficiencies which might arise in their account in the interim.[19] The Milos' further allege that on September 24, 1987, Nick Milos reminded Parillo of this agreement, of which Parillo acknowledged.[20] Parillo purportedly gave this promise because of the difficulty First Union was experiencing in obtaining computer printouts for the Milos' account.[21] First Union denies that there was any promise made in September of 1987, or at any other time, of an extension until November 15, 1987 for the Milos' to meet margin calls or cure other deficiencies in their account.

It is uncontroverted that the Margin Agreement was executed on September 22, 1987, subsequent to Parillo's alleged prom-ise of September 15, 1987 to extend the time within which the Milos' could meet margin calls or cure other deficiencies.[22] A review of the Agreement reveals that it not only fails to contain Parillo's alleged promise, but expressly contradicts any such promise. The Agreement explicitly addresses the duty of First Union or Pershing to notify the Milos' of the margin status of their account, the right to collect loans and to enforce margin calls and liens against the Milos' account.[23] In particular, paragraph 5 of the Agreement empowers First Union or Pershing to liquidate the Milos' account without prior notice or demand for additional margin, and within the firm's discretion.

It is well-established that under Florida law, "[r]epresentations, negotiations, and conversations which precede or are contemporaneous with the making of a contract are presumed to have merged in the written agreement." *Azar v. Richardson Greenshields Sec., Inc.*, 528 So.2d 1266, 1269 (Fla. 2d DCA 1988); *Windowmaster Corp. v. Jefferson Constr. Co.*, 114 So.2d 626 (Fla. 3d DCA 1959). Accordingly, this Court holds as a matter of law that the oral promises allegedly made by Parillo prior to the signing of the Margin Agreement have merged into the Agreement.

A corollary to the merger doctrine is the parol evidence rule. Under the parol evidence rule, "evidence of a prior or contemporaneous oral agreement is inadmissable to vary or contradict the unambiguous language of a valid contract." *Chase Manhattan Bank v. Rood*, 698 F.2d 435, 436 (11th Cir.), *reh'g denied*, 703 F.2d 582 (1983); *Schwartz v. Zaconick*, 68 So.2d 173, 174–75 (Fla.1953). Although Federal law ordinarily governs the admissability of evidence in diversity actions, the parol evidence rule is treated as a rule of substantive law. *Rood*, 698 F.2d at 436 n. 1 (citing

---

19. May 18, 1990 Deposition of Nick Milos, pp. 3–4 Exhibit "A"; November 30, 1989 Deposition of Nick Milos, pp. 73–74, Exhibit "B" to First Union's Motion for Summary Judgment on its Complaint.

20. November 30, 1989 Deposition of Nick Milos, p. 79, Exhibit 3; July 2, 1990 Affidavit of Nick Milos, Exhibit 9 to the Milos' Memorandum in Opposition to First Union's Motion for Summary Judgment.

21. November 30, 1989 Deposition of Nick Milos, pp. 72, 81, Exhibit 3 to the Milos' Memorandum.

22. May 17, 1990 Deposition of Nick Milos, pp. 73–74, 76–77, Exhibit "B" to First Union's Motion for Summary Judgment on its Complaint.

23. Exhibit 2 to the Milos' Memorandum, paras. 1, 2, 4–6, and 8.

*Southern Stone Co. v. Singer*, 665 F.2d 698, 701 (5th Cir.1982) (Unit B)). Any evidence proffered by the Milos' as to Parillo's alleged promise not to enforce margin calls would necessarily contradict the unambiguous language of the Margin Agreement. Accordingly, any such evidence is barred by the parol evidence rule.

■ This Court further finds that Parillo's alleged acknowledgement of his promise of September 15, 1987 to extend the time within which the Milos' could meet margin calls and cure other deficiencies in their account could not give rise to an enforceable contract. The Milos' assert that on September 24, 1987, Parillo acknowledged his promise. This was after the execution of the Margin Agreement on September 22, 1987, and before the Milos' departure on their vacation on September 28, 1987. Given that Parillo's puported promise of September 15, 1987 to allow the Milos' additional time to meet margin calls or other deficiencies in their account is barred by both the merger doctrine and the parol evidence rule, this Court holds that the acknowledgment of such promise is similarly unenforceable.

### B. Motion for Summary Judgment on Amended Counterclaim

The Milos' filed an Amended Counterclaim asserting therein claims for: violation of Fla.Stat. § 517.301 (Count I); common law fraud (Count II); breach of fiduciary duty (Count III); negligence (Count IV); breach of contract (Count V); and violation of Fla.Stat. § 517.12 (Count VI).[24] First Union asserts as affirmative defenses that: (i) First Union did not proximately cause the Milos' losses; (ii) the Milos' ratified all transactions by failing to object to the transactions or the October, 1987 account balance; (iii) the Milos' failed to give consideration for First Union's purported promise to allow the Milos' until November 15, 1987 to cure margin calls or other deficiencies in their account; (iv) the Milos'

**24.** The Milos' originally filed a (7) Count Counterclaim, Count I of which asserted a claim for violation of Section 12(2) of the Securities Act of 1933. In *First Union Brokerage v. Milos*, 717 F.Supp. 1519, 1522 (S.D.Fla.1989) (Spellman, J.), this Court held that this statute does not provide relief for acts or omissions in connection with

failed to mitigate their damages; and (v) that the Milos' claims are barred by the Statute of Frauds and the parol evidence rule.

### 1. Violation of Fla.Stat. § 517.301—Count I

■ In Count I of their Amended Counterclaim, the Milos' seek to recover under Section 517.301 of the Florida Securities and Investor Protection Act, Fla.Stat. § 517.011 *et seq.* To prevail on a claim for violation of Section 517.301, a party must prove the following:

(1) a misrepresentation or omission of a material fact; (2) that the investor justifiably relied on said misrepresentation or omission; (3) that the misrepresentation or omission was made in connection with a purchase or sale of securities; (4) with scienter or reckless disregard as to the truth of the communications; and (5) that the untruth was the direct proximate cause of the investor's actual loss.

*Milos*, 717 F.Supp. at 1523 (citing *Currie v. Cayman Resources Corp.*, 835 F.2d 780, 785 (11th Cir.1988)); *Gochnauer v. A.G. Edwards & Sons, Inc.*, 810 F.2d 1042, 1046 (11th Cir.1987).

First Union argues that the Milos' must also prove privity between themselves and First Union in connection with a particular purchase or sale of securities. *E.F. Hutton & Co. v. Rousseff*, 537 So.2d 978, 981 (Fla.1989). It asserts that the Milos' have offered no evidence whatsoever that the securities purchased or sold in the instant case were owned or purchased by either First Union or Pershing.

■ Fla.Stat. § 517.211(2), which operates upon Section 517.301, provides that: Any person purchasing or selling a security in violation of s. 517.301, and every director, officer, partner, or *agent of or for the purchaser or seller*, if the director, officer, partner, or agent has

trading on the secondary market. Insofar as the Milos' claim pertained to securities traded on the secondary market, and not to the purchase of securities in connection with a new offering, prospectus or registration, this Court dismissed their claim for violation of Section 12(2).

personally participated or aided in making the sale or purchase, is jointly and severally liable to the person selling the security to or purchasing the security from such person in an action for rescission, if the plaintiff still owns the security, or for damages, if the plaintiff has sold the security. (emphasis added). As this Court previously held in *Milos*, 717 F.Supp. at 1524, "Section 517.211 expressly provides for liability premised upon the theory of agency." (footnoted omitted). In a long line of cases, investors have successfully brought suit against their stock brokers for violation of Section 517.301. *See generally Friedman v. Bache & Co*, 321 F.Supp. 347 (S.D.Fla.1970), *aff'd*, 439 F.2d 349 (5th Cir.1971); *Kasner v. H. Hentz & Co.*, 475 F.2d 119 (5th Cir.), *cert. denied*, 414 U.S. 823, 94 S.Ct. 124, 38 L.Ed.2d 57 (1973); *Merrill Lynch, Pierce, Fenner & Smith v. Byrne*, 320 So.2d 436 (3d DCA 1975); and *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Del Valle*, 528 F.Supp. 147 (S.D.Fla.1981) (Spellman, J.). As such, this Court holds that the Milos' need only prove agency between themselves and First Union, and need not establish privity of contract in the purchase or sale of securities.

■■■■ The uncontroverted evidence reflects that First Union took the Milos' orders as their agent; transmitted the Milos' orders to Pershing, which in turn executed the orders on the exchanges and confirmed them as First Union's agent; and that First Union was paid a commission on every trade by the Milos'.[25] Accordingly, this Court finds that First Union, as agent for the Milos' in the sale and purchase of securities, falls within the designated class of individuals which may be held liable for violation of Section 517.301.

First Union further argues that the Milos' cannot demonstrate any genuine issue of material fact as to any actionable misrepresentation in connection with the purchase or sale of a security, or justifiable reliance thereon. The Milos' respond by asserting that First Union's alleged misrep-

resentations which were designed to keep them a very productive and profitable account constitutes misrepresentations in connection with the purchase or sale of securities. As this Court previously held:

> With respect to the 'in connection with' component it is evident to this Court that the Plaintiff's alleged misrepresentation was intended to induce Defendants to continue trading securities through First Union.

*Milos*, 717 F.Supp. at 1523. However, as more fully set forth below in this Court's discussion of Count II of the Milos' Amended Counterclaim, this Court finds that there is no genuine issue of material fact that First Union is not liable for common law fraud. Accordingly, this Court similarly finds that there is no genuine issue of material fact that First Union did not make any misrepresentations in violation of Fla. Stat. § 517.301, upon which the Milos' justifiably relied to their detriment.

### 2. Common Law Fraud—Count II

■■■■ In Count II of their Amended Counterclaim, the Milos' assert a claim for common law fraud. To prevail on a claim for common law fraud, a party must prove the following: (i) a false statement concerning a material fact; (ii) knowledge by the maker of the statement that the representation is false; (iii) intent by the maker of the statement that the representation will induce another to act on it; and (iv) justifiable reliance on the representation to another's detriment. *Lance v. Wade*, 457 So.2d 1008, 1011 (Fla.1984); *Milos*, 717 F.Supp. at 1524–25. Though fraud requires that a misrepresentation be intentional, this element may be satisfied by evidence of reckless or mere negligent conduct. *Gochnauer*, 810 F.2d at 1046.

If the intentional misrepresentation is made in connection with a promise to do some act in the future, the party alleging fraud must further prove "that the promisor either lacked the intention to perform

---

**25.** *See* the "Fully Disclosed Clearing Agreement" entered into by Pershing and First Union, p. 2, para. 3, Exhibit 10 to the Milos' Memorandum (providing that Pershing is to act as Broker's agent); and sample confirmation and monthly statements, composite Exhibit 12 to the Milos' Memorandum.

the promise or specifically intended not to perform at the time that the representation was made." *Milos,* 717 F.Supp. at 1525 (citing *Royal Typewriter Co. v. Xerographic Supplies Corp.,* 719 F.2d 1092, 1104 (11th Cir.1983)). Merely breaking a promise to perform an act in the future does not constitute fraud. First Union asserts that the Milos' failed to prove this additional element in connection with their allegations that First Union assured them that margin calls would not be enforced for a two-month period in the future (until November 15, 1987).

First Union has continually maintained that it made no promises to the Milos with regards to the time within which they were to be allowed to meet margin calls. If the trier-of-fact determines that such promise was made, the intent to perform such promise at the time it was made would be clearly lacking. In the alternative, First Union has also maintained that it advised the Milos' that Parillo had no authority to promise them that they would have until November 15, 1987 to cure margin calls in their account. If the trier-of-fact believes the Milos', it may infer that Parillo knew that he had no authority to making such a promise. At a minimum, the trier-of-fact could find that such representation was negligent, if not reckless.

■ First Union asserts that even if this Court were to assume *arguendo* that Parillo misrepresented that First Union would not enforce margin calls until November 15, 1987, the Milos' nevertheless fail to make any showing of justifiable reliance. This Court agrees. Where, as in the instant case, such a misrepresentation directly conflicts with the explicit language of the Margin[26] and Option agreements[27] which gave First Union and Pershing the discretion to liquidate the Milos' account, it must be presumed that the Milos' read the contents of the agreements and that such knowledge be imputed to them. Reliance on any such oral misrepresentation which is contradicted by written agreements is unjustified and reckless. *Acme Propane*

*v. Tenexco, Inc.,* 844 F.2d 1317, 1322 (7th Cir.1988).

### 3. Breach of Fiduciary Duty—Count III

■ In Count III of their Amended Counterclaim, the Milos' assert a claim for breach of fiduciary duty. It is well-established that a securities broker owes a fiduciary duty to their investors. *Milos,* 717 F.Supp. at 1526 (citing *Gochnauer,* 810 F.2d at 1049); *Thompson v. Smith Barney, Harris Upham & Co.,* 709 F.2d 1413, 1418 (11th Cir.1983); and *Dupuy v. Dupuy,* 551 F.2d 1005, 1015 (5th Cir.), *reh'g denied,* 554 F.2d 1065 (1977), *cert. denied,* 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977). Fiduciary duties associated with non-discretionary accounts, such as the one in the instant case, may include:

> (1) the duty to recommend [investments] only after studying it sufficiently to become informed as to its nature, price, and financial prognosis; (2) the duty to perform the customer's orders promptly in a manner best suited to serve the customer's interests; (3) the duty to inform the customer of the risks involved in purchasing or selling a particular security; (4) the duty to refrain from self-dealing ...; (5) the duty not to misrepresent any material fact to the transaction; and (6) the duty to transact business only after receiving approval from the customer.

*Milos,* 717 F.Supp. at 1526 (quoting *Gochnauer,* 810 F.2d at 1049).

■ First Union argues that only one of the foregoing fiduciary duties applies in the instant case. First Union asserts that as a discount broker, it did not manage the Milos' account nor advise the Milos' on investments, such that they only owed the Milos' the duty not to misrepresent any fact material to transactions. This Court agrees.

■ The Milos' allege that First Union breached its fiduciary duty by engaging in self-dealing by causing certain transactions to take place, which, but for Parillo's mis-

---

**26.** Exhibit 2 to the Milos' Memorandum.

**27.** Exhibit "F" to First Union's Motion for Summary Judgment on its Complaint.

representations, would not have occurred. For instance, the Milos' assert that had Parillo not agreed to provide them with an extension until November 15, 1987 to meet margin calls in their account, they would have immediately ceased trading with First Union.

■ This Court holds that because the express terms of the Option and Margin agreements permitted liquidation of the Milos' account in its sole discretion, First Union could not have owed a fiduciary duty to refrain from exercising pre-existing contract rights by allegedly misrepresenting when margin calls would be due. When a contract expressly permits liquidation in the broker's sole discretion, the common law duties are defined consistently with the contract. *Misabec Mercantile, Inc. de Panama v. Donaldson, Lufkin & Jenrette ACLI Futures, Inc.*, 853 F.2d 834, 839 (11th Cir.1988).

### 4. Negligence—Count IV

■ In Count IV of their Amended Counterclaim, the Milos' assert a claim for negligence. The Milos' sole assertion of damages arise from First Union's alleged failure to convey timely and accurate information to the Milos'. First Union argues that absent a finding of a breach of fiduciary duty, its only obligation to the Milos' was to enter their orders within a reasonable period of time. *Robinson v. Merrill Lynch, Pierce Fenner & Smith*, 337 F.Supp. 107, 111–114 (N.D.Ala.1971), *aff'd*, 453 F.2d 417 (5th Cir.1972). This Court agrees.

### 5. Breach of Contract—Count V

■ In Count V of their Amended Counterclaim, the Milos' assert a claim for breach of contract. As previously mentioned in this Court's discussion of First Union's claim for breach of contract, the Milos' allege that on September 15, 1987, prior to entering into the Margin and Option agreements with First Union and Pershing on September 22, 1987, Parillo orally agreed not to enforce margin calls until November 15, 1987 which might be generated during the preceding two months. As this Court previously held, such promise is barred by both the merger doctrine and the parol evidence rule. *Azar*, 528 So.2d at 1269; *Rood*, 698 F.2d at 436. Similarly, this Court held that Parillo's alleged acknowledgment of this promise is not an enforceable contract.

The Milos' also assert a claim for breach of contract on First Union's alleged failure to provide them with timely and accurate computer printouts reflecting the status of their account. It is uncontroverted that such promise was made no later than July of 1987 when Parillo gave Nick Milos an office to use, and thus, before the execution of the Margin and Option agreements. In the absence of any such provision in the agreements, both the merger doctrine and parol evidence rule preclude the Milos' from arguing that any such provision was part of the parties' agreement.

### 6. Violation of Fla.Stat. § 517.12—Count VI

■ In Count VI of their Amended Counterclaim, the Milos' seek to rescind certain unidentified transactions pursuant to Fla.Stat. § 517.12. The Milos' allege that Gerry Daras, a wire operator with First Union, entered sales for the Milos' account in violation of this section.

The remedies for violation of Section 517.12 are set forth in Fla.Stat. § 517.211 which authorizes rescission only if the purchaser still owns the securities, the purchase of which is being rescinded. It reads in pertinent part:

(1) Every sale made in violation of ... § 517.12 may be rescinded at the election of the purchaser; the person making the sale ... is liable to the purchaser in an action for rescission, *if the purchaser still owns the security*, or for damages, if the purchaser has sold the security.

\* \* \* \* \* \*

(3) In an action for rescission:
(a) A purchaser may recover ... *upon tender of the security or investment.* (emphasis added).

It is uncontroverted that the Milos' no longer own any of the securities and has

**1158**

not owned them since November of 1987. Accordingly, Count VI must be dismissed.

Based on the above and foregoing, it is hereby

ORDERED AND ADJUDGED as follows:

1. First Union's Motion for Summary Judgment on its Complaint is GRANTED as to ALL COUNTS.

2. First Union's Motion for Summary Judgment on the Milos' Amended Counterclaim is GRANTED as to ALL COUNTS.

3. First Union is directed to provide this Court a proposed Final Judgment within 10 days of the instant Order.