**FIRST UNION DISCOUNT BROKERAGE SERVICES, INC., Plaintiff–Appellee, Counter–Defendant,**

v.

**Nick P. MILOS, Catherine P. Milos, Defendants–Appellants, Counter–Plaintiffs.**

No. 91–5818.

United States Court of Appeals, Eleventh Circuit.

Aug. 9, 1993.

Robert Wayne Pearce, Yueh–Mei Kim Nutter, Ft. Lauderdale, FL, for appellants.

Nancy A. Copperthwaite, Keith Olin, Miami, FL, for appellee.

Before TJOFLAT, Chief Judge, EDMONDSON, Circuit Judge, and DYER, Senior Circuit Judge.

TJOFLAT, Chief Judge:

The stock market crash of October 1987 signaled the beginning of the end of the booming 1980s. It shattered dreams, ruined investors, and precipitated this litigation. A discount broker sued one of its customers to recover the post-liquidation debit balance in the customer's account following substantial losses sustained during the crash. The customer refused to pay and answered the broker's suit with a seven-count counterclaim. The district court dismissed one count and later granted summary judgment in favor of the discount broker on the broker's complaint and the customer's remaining counts. We affirm.

## I.

Nick Milos began investing in the securities market around 1945. On February 27, 1984, Mr. Milos and his wife, Catherine, opened a nondiscretionary securities account with Dis–Com Securities, Inc., which First Union Discount Brokerage Services, Inc. (First Union) acquired later that year. First Union is a discount broker and, as such, charges its customers lower commissions than those charged by full service brokers. First Union accepts orders from customers for the purchase and sale of securities, but, unlike its full service counterparts, does not provide such amenities as research and investment advice.

Though not itself a member of the securities exchanges, First Union is able to execute its customers' orders by contracting with a member firm—a clearing broker. During the summer and early autumn of 1987, Cowen & Co. (Cowen) served as First Union's clearing broker; it executed transactions, prepared and mailed trade confirmations, settled transactions in options and securities, handled margin accounts, and maintained records of the transactions that it executed. During late September and early October 1987, Pershing & Co., Inc. (Pershing) transitionally succeeded Cowen as First Union's clearing broker.

The Miloses concentrated heavily on "writing" put options—a risky strategy that tends to be profitable when the price of the underlying security increases, but can be disastrous when the price declines. A put option is a contract that entitles the buyer of the put to sell a specified number of shares of a particular security to the writer of the put at a specified "strike" price at or within a speci-

fied time.[1] If the market price of the underlying security decreases below the strike price and the owner of the put exercises the option to sell the underlying security (and the difference between the strike price and the market price of the underlying security exceeds the writer's premium from the original sale of the option), the writer will lose money. When buyers of puts exercise their options, the put writer's clearing broker will purchase the shares from the buyer of the put at the strike price, and post either a loss or gain to the put writer's account depending on the difference between the underlying security's price on the open market and the strike price.

A writer of put options must either trade on "margin" or maintain a minimum account balance equal to the aggregate exercise prices of all the outstanding puts that the writer has written. The Miloses chose to trade a large number of their put options on margin. By trading on margin, the Miloses deposited in their First Union account only a portion of the funds necessary to cover all of the options they had written, and "borrowed"[2] the remainder from Cowen and then Pershing.[3]

As the price of the underlying security drops, the put option writer's potential losses mount. If the put writer sells on margin, the broker's "loaned" funds are also at risk. As the potential losses escalate, so too does the risk that the writer will not have sufficient funds to pay off margin obligations to the lending broker. To protect themselves, brokers issue margin calls[4] requiring investors to deposit more funds or other collateral into their margin accounts when their balances drop below a certain equity percentage. If investors fail to meet margin calls in their accounts, their brokers, pursuant to contract, may liquidate their positions to satisfy the margin calls.

As clearing brokers, Cowen and then Pershing monitored the daily margin requirements in the Miloses' account, and generated comprehensive customer account printouts reflecting their securities positions and account information. Cowen and then Pershing sent these printouts to First Union,

1. Investors value put options based on the relationship between the market and strike price of the underlying security, the security's historical performance, future expectations about the security's performance horizon, the time until the option expires, and a host of other tangible and intangible considerations. Consider XYZ Company with shares trading on the open market at $100 per share, its highest point in 52 weeks. Although most financial analysts are bullish on the stock, Investor believes—and is willing to bet—that XYZ Company is in for some very hard times in the next few months. Investor purchases some put option contracts with a $90 strike price which are set to expire in four months. Because the strike price is a full $10 below market and the investment community favors XYZ Company, Investor bought each put at, say, $1.

 If XYZ's stock climbs to $105 per share, Investor's puts look less attractive than they did when purchased, and their price should fall a bit, perhaps to $0.75 each. If XYZ's stock falls to $95 per share, Investor's puts look more attractive, and their price should rise some, perhaps to $1.50 each (option prices are not equally sensitive to upward and downward movements in the price of the underlying stock). Of course, Investor hopes that XYZ plummets below the $90 strike price, in which case the market will value Investor's puts at least as much as the difference between the strike price and the market price. For example, if XYZ drops to $85 per share, then the puts will be worth at least $5 each (the $90 strike price less the $85 market price of the underlying security).

 At this point, Investor may find it advisable to exercise the put options. Investor may either sell the put to another investor for the market price of the put ($5 in this example), or compel the writer of the put to buy shares of XYZ company from Investor at the strike price.

2. We use the terms "borrow" and "loan" for simplicity. In fact, put writers do not borrow, and clearing brokers do not loan, funds in the traditional sense. Put writers do not realize losses until the buyer of the put options exercises them; until then, losses exist only on paper. The margin requirements serve as a cushion against potential losses.

3. Federal regulations restrict the extension of credit by brokers to their customers for investment purposes. See 12 C.F.R. §§ 220.4, 220.5, and 220.18 (1992).

4. A margin call is a demand by a broker that an investor deposit "additional cash or securities to eliminate or reduce a margin deficiency." See 12 C.F.R. § 220.2(n) (1992). A "margin deficiency" results when the equity in an investor's account is less than that required by law to support the account's liabilities. See 12 C.F.R. § 220.2(o) (1992).

which, in turn, provided them to Mr. Milos, upon his request.[5]

In May or June 1987, and in recognition of the extremely high commissions that the Miloses' trading generated, First Union provided Mr. Milos with a semi-private office, a Quotron machine, and, upon his request, comprehensive account information printouts. With over 100 active securities positions, Mr. Milos relied on these printouts to track the investments and account equity.

As September 1987 neared, Mr. Milos became concerned about his ability to follow his securities positions because of his impending September 28 through October 14, 1987 vacation to Russia with Mrs. Milos. On September 15, 1987, Barry Parillo, a First Union branch manager, told Mr. Milos that he would have thirty days from his return, until November 15, 1987, to cure any margin problems that may arise in his account.[6] The clearing broker was having difficulty supplying timely and accurate account information and it was hard to determine the precise financial condition of the Miloses' account.

On September 22, 1987, the Miloses signed a Margin Agreement and an Option Agreement, both of which expressly granted First Union and Pershing (which was replacing Cowen as First Union's clearing broker) full discretion to protect themselves by liquidating the Miloses' securities positions at any time without notice.[7] Paragraph six of the Margin Agreement obligated the Miloses to pay off any deficiency balance that might exist following such a liquidation.[8] Two days after the Miloses signed these agreements, Mr. Milos reminded Parillo of the margin call extension to November 15, and Parillo "acknowledged" it. On September 28, the Miloses left for Russia.

As the stock market declined between October 8 and 14, Pershing issued but did not enforce house maintenance calls on the Miloses' account.[9] Mr. Milos went to the First Union office on Friday, October 16, a day after returning to Florida. Parillo informed Mr. Milos of, but did not enforce, the house maintenance calls in his account. The customer account information printout generated by Pershing indicated that the Miloses had an equity percentage of 76%, a comforta-

---

5. First Union provided the printouts to Mr. Milos because he made all of the investment decisions for himself and his wife.

6. Because the Miloses appeal from a grant of summary judgment, we present the facts in the light most favorable to them. We note, however, that First Union vigorously disputes many of the Miloses' allegations, including this one.

7. The Margin Agreement provided:

If in your [First Union's or Pershing's] discretion you consider it necessary for your protection to require additional collateral .... you shall have the right to sell any or all securities, commodities and other property in the accounts of the undersigned with you ..., to buy any or all securities, commodities and other property which may be short in such accounts, to cancel any open orders and to close any or all outstanding contracts, all without demand for margin or additional margin, notice of sale or purchase or other notice or advertisement.... It being understood that a prior demand, or call, or prior notice of the time and place of such sale or purchase shall not be considered a waiver of your right to sell or buy without demand or notice.

The Option Agreement provided:
5. The undersigned understands that option trading may result in additional margin re-

quirements and the undersigned agrees to put up the additional money or securities on a timely basis (when you so request).
....
7. If the undersigned does not satisfy, on a timely basis, your money or security calls, you are authorized in your sole discretion, and without notification, to take any and all steps you deem necessary to protect yourself (for any reason) in connection with option transactions for the undersigned's account.... Any and all expenses or losses incurred in this connection will be reimbursed by the undersigned.

8. Paragraph 6 of the Margin Agreement provided:

The undersigned [the Miloses] shall at all times be liable for the payment upon demand of any debit balance or other obligations owing in any of the accounts of the undersigned with you [First Union and Pershing] and the undersigned shall be liable to you for any deficiency remaining in any such accounts in the event of the liquidation thereof, in whole or in part, ... and the undersigned shall make payments of such obligations and indebtedness upon demand.

9. House maintenance calls are issued by clearing brokers to enforce margin requirements slightly above those of the stock exchanges.

ble and perfectly acceptable number.[10] Accordingly, Parillo told Mr. Milos that he thought that the maintenance calls were mistaken, he would verify the account information, and he would get back to Mr. Milos later that day. Neither Parillo nor any other First Union employee confirmed with Mr. Milos later that day that the calls were correct, and no First Union employee requested that the Miloses deposit additional funds or collateral into their account. The Miloses later determined that the October 16 printout overstated their account equity by more than $600,000, and that the account actually had an equity percentage under 70% on that day.[11] The Miloses now claim that if they had known that they had to meet the margin call and that First Union would not grant them the November 15 extension, then they would have liquidated some or all of their positions to meet the calls that day.

On Monday, October 19, the stock market collapsed; the Dow Jones Industrial Average dropped an unprecedented 508 points in a single day. The stock market crash did not bode well for the Miloses' short put option positions, and the New York Stock Exchange (NYSE) generated a $1.2 million margin call in the Miloses' account. Later that day, Parillo informed Mr. Milos that Robert Flowers, the president of First Union, wanted to meet with him.

At their meeting the next day, Flowers notified Mr. Milos of the margin call, advised him that the call must be satisfied immediately, and, in the alternative, offered him the opportunity to direct the manner of the account's liquidation. Mr. Milos told Flowers that Parillo had assured him of an extension until November 15 to meet any margin calls. Flowers, in response, told Mr. Milos that Parillo lacked the authority to grant such an extension. Mr. Milos, however, refused to meet the call. The next day, First Union began liquidating the Miloses' account. At the end of the week when First Union had completely liquidated the Miloses' account, the account had a deficiency of $265,500.49. After the Miloses refused to satisfy this deficiency, First Union paid Pershing the debit balance.

First Union's October 1987 statement to the Miloses reflects the $265,500.49 debit balance. On the back of the statement, and in bold print, First Union informed the Miloses that, unless they objected in writing within 10 days, the statement would be deemed an "account stated," an agreement between the parties as to an existing obligation. The Miloses never objected in writing.

On December 16, 1987, First Union brought this action against the Miloses to recover $265,500.49. First Union's complaint alleged three counts: (1) an account stated, (2) an open account, and (3) breach of the Margin and Option Agreements. The Miloses answered with a general denial of liability, and filed a seven-count counterclaim including the claim that First Union violated section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*(2) (1988), by making material false representations.

On September 2, 1988, First Union moved to dismiss the counterclaim. The district court found that section 12(2) does not provide relief for false representations in connection with trading in secondary markets and dismissed the section 12(2) count of the counterclaim; it denied, however, First Union's motion to dismiss the other six counts. *First Union Brokerage v. Milos,* 717 F.Supp. 1519, 1522, 1527 (S.D.Fla.1989) (*Milos I* ).

The Miloses, with leave of court, subsequently amended their counterclaim and alleged, in six counts, that First Union (1) violated Fla.Stat. § 517.301 (1989), a state

---

**10.** In his deposition, Mr. Milos testified that he liked to keep his equity percentage above 70%, and that First Union required an equity percentage above 35%.

**11.** In his deposition, however, Mr. Milos testified to the contrary as follows:

 Q. Were the printouts correct?
 A. As far as I was concerned, they were correct.
 . . . .

 Q. Do you know if they were correct or not?
 A. They were correct. As far as what my equity was with the stocks that I owned against what I owed First Union, they were correct.
 Q. Have you gone back and checked that?
 A. Yes, I have.
 Q. And were they also—when did you do that?
 A. Lots of times.

securities anti-fraud statute, by making false representations, (2) committed common law fraud, (3) breached its fiduciary duty, (4) was negligent in providing information to them about their account, (5) breached the Margin Agreement, and (6) violated Fla.Stat. ch. 517.12 (1989), by trading through unlicensed sales people. First Union moved separately for summary judgment on its complaint and on the Miloses' amended counterclaim. On August 13, 1990, the district court granted both motions, *see First Union Discount Brokerage Servs., Inc. v. Milos*, 744 F.Supp. 1145, 1147 (S.D.Fla.1990) (*Milos II*), and, on July 31, 1991, entered a final judgment awarding First Union damages, interest, attorney's fees, and costs totaling $492,548.26. The Miloses appeal.

## II.

■ Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). We review the district court's grant of summary judgment *de novo, see Regan v. U.S. Small Business Admin.*, 926 F.2d 1078, 1080 (11th Cir.1991), and review the evidence and draw related inferences in the light most favorable to the Miloses, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). We also review the district court's dismissal of the Miloses section 12(2) counterclaim *de novo. See United States Fire Ins. Co. v. Caulkins Indiantown Citrus Co.*, 931 F.2d 744, 747 (11th Cir.1991). We conclude that the district court properly granted summary judgment in First Union's favor on all claims, and properly dismissed the Miloses' section 12(2) counterclaim.

In part III, we consider the district court's grant of First Union's motion for summary judgment on its complaint, and, in part IV, we consider its grant of the motion to dismiss the section 12(2) claim in the original counterclaim and its grant of the motion for summary judgment on the Miloses' amended counterclaim.

## III.

■ The district court found that the Miloses owed a debt to First Union and granted First Union summary judgment on count one, alleging an account stated, of its complaint. An account stated is a firmly established claim in Florida. *See Martyn v. Amold*, 36 Fla. 446, 18 So. 791, 793–94 (1895); *Raben Builders, Inc. v. First Am. Bank & Trust Co.*, 561 So.2d 1229, 1231 (Fla.Dist.Ct. App.1990); *Merrill–Stevens Dry Dock Co. v. "Corniche Express"*, 400 So.2d 1286, 1286 (Fla.Dist.Ct.App.1981); *Nicolaysen v. Flato*, 204 So.2d 547, 549 (Fla.Dist.Ct.App.1967). "For an account stated to exist, there must be an agreement between the parties that a certain balance is correct and due and an express or implicit promise to pay this balance." *Carpenter Contractors of Am., Inc. v. Fastener Corp. of Am., Inc.*, 611 So.2d 564, 565 (Fla.Dist.Ct.App.1992). "[T]he practice of periodic billing in the regular course of dealing may establish an account stated if no objection to the amount of the bill is made within a reasonable time." *FDIC v. Brodie*, 602 So.2d 1358, 1361 (Fla.Dist.Ct.App.1992).

■ First Union mailed the Miloses a monthly Statement of Account covering the period September 26 through October 30, 1987. The statement indicated that the Miloses had a debit balance of $265,500.49, and the reverse side of the statement, in bold print, declared:

This statement will be deemed an account stated unless you advise us in writing of any objection to it within ten days after receipt. Any such objection should be sent to FIRST UNION BROKERAGE SERVICES, INC., at the address on the front of the statement.

The Miloses did not object in writing, and their failure to do so sires an account stated. This, in turn, begets a presumption in First Union's favor that the debit balance was correct. *See Martyn*, 18 So. at 793–94 ("An account stated ... establishes prima facie the accuracy and correctness of the items, and, unless, this presumption is overcome by

proof of fraud, mistake, or error, it becomes conclusive."); *Robert C. Malt & Co. v. Kelly Tractor Co.*, 518 So.2d 991, 992 (Fla.Dist.Ct. App.1988) (an account stated creates presumption of correctness of amount of debt); *Home Health Servs. of Sarasota, Inc. v. McQuay–Garrett, Sullivan & Co.*, 462 So.2d 605, 606 (Fla.Dist.Ct.App.1985) ("An account stated is prima facie evidence of the correctness of the items it contains and of the liability of a party for those items.").

The Miloses do not dispute that they failed to object in writing to the statement of account. Rather, they argue that First Union is not the real party in interest because Pershing, not First Union, lent them the funds that enabled them to trade on margin. They argue, as they did below, that First Union failed to plead or prove either that Pershing assigned its rights to collect the debit balance in the Miloses' account or that First Union otherwise became equitably subrogated to Pershing's collection rights.

■ The district court noted that the Miloses first raised this argument in their Memorandum in Opposition to First Union's Motion for Summary Judgment, and it dismissed this argument as untimely. The court held that "if the Milos' had any genuine question whether First Union was the real party in interest entitled to bring this action, it was their obligation to raise such question promptly." *Milos II*, 744 F.Supp. at 1152. Because First Union is the real party in interest, the question of timeliness is irrelevant.[12]

First Union paid Pershing the full amount of the Miloses' deficiency. The Statement of Account informed the Miloses that First Union had advanced them the money to pay off their obligation to Pershing, and, accordingly, that they were indebted to First Union. Having satisfied the Miloses' obligation to Pershing, First Union could then proceed against the Miloses to recover the funds that it advanced.

Because we hold that the district court properly granted summary judgment for First Union on count one of its complaint, we need not consider the district court's rulings on the remaining two counts of the complaint.

## IV.

Having affirmed the district court's grant of summary judgment on First Union's complaint, we turn our attention to the court's rulings in First Union's favor on the Miloses' original and amended counterclaims. In subpart A, we consider count one of the Miloses' original counterclaim, the section 12(2) claim. In subpart B, we discuss counts one through five of the Miloses' amended counterclaim. In subpart C, we address count six of the amended counterclaim, the § 517.12 claim for rescission of trades by unauthorized personnel.

## A.

In count one of their original counterclaim, the Miloses alleged that First Union violated section 12(2) of the 1933 Securities Act. Section 12(2) of the 1933 Act provides that any person who

offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and

12. We note, however, that some of our sister circuits have held that defendants may waive real party in interest defenses by failing to raise the defense in a timely fashion. *See, e.g., Gogolin & Stelter v. Karn's Auto Imports, Inc.*, 886 F.2d 100, 103 (5th Cir.1989) (defense waived when raised for first time in motion for directed verdict), *cert. denied*, 494 U.S. 1031, 110 S.Ct. 1480, 108 L.Ed.2d 617 (1990); *Hefley v. Jones*, 687 F.2d 1383, 1388 (10th Cir.1982) (defense waived when raised for first time 16 days before trial); *Chicago & Northwestern Transp. Co. v. Negus–Sweenie, Inc.*, 549 F.2d 47, 50 (8th Cir.1977) (defense waived when raised for first time on appeal); *see also* Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1554 (1990 & Supp.1992) (real party in interest defense should be raised "with reasonable promptness.... [o]therwise, the court may conclude that the point has been waived by the delay").

in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him ... for damages if [the purchaser] no longer owns the security.

15 U.S.C. § 77*l* (2) (1988).

■ The district court held that section 12(2) does not apply to securities transactions in the aftermarket and dismissed the Miloses' section 12(2) claim. *Milos I,* 717 F.Supp. at 1522–23. In *Ryder International Corporation v. First American National Bank,* 943 F.2d 1521, 1530 n. 16 (11th Cir.1991), we left unresolved whether section 12(2) applies to aftermarket transactions. We now decide that it does not.

The Third Circuit was the first court of appeals to consider whether section 12(2) applies to aftermarket transactions. In *Ballay v. Legg Mason Wood Walker, Inc.,* 925 F.2d 682 (3d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 79, 116 L.Ed.2d 52 (1991), investors and their stockbroker sued a full service broker for making certain oral false representations in connection with the recommendation and sale of stock. The court held that section 12(2) does not apply to aftermarket transactions for three reasons.

First, the court determined that section 12(2)'s language limits the section's scope to initial distributions. The court noted "[t]he fact that 'oral communication' keeps company with 'prospectus' suggests ... that the more general term be limited to conform to the more restrictive term." *Id.* at 688. Because Congress clearly defined and intended "prospectus" to relate to initial offerings of securities, *see* 15 U.S.C. § 77b(10) (1988), the court reasoned that section 12(2)'s admonition against oral false representations is similarly limited to initial offerings.

Second, the court noted that section 12(2) is structurally positioned after sections 11 and 12(1), which respectively govern the registration of securities and create civil liability for sales of unregistered securities, and before section 13, which establishes a limitations period for sections 11 and 12. *Id.* at 691. Because section 12(2) is sandwiched between sections that deal exclusively with initial distributions, it too must be so limited.

Third, the court rejected the suggestion that the Supreme Court's holding in *United States v. Naftalin,* 441 U.S. 768, 99 S.Ct. 2077, 60 L.Ed.2d 624 (1979), required application of section 12(2) to the aftermarket. In *Naftalin,* the Court held that section 17(a) of the 1933 Act applies to transactions in secondary markets. *Id.* at 771–74, 99 S.Ct. at 2081–82. The Third Circuit rejected this argument by analogy because sections 12(2) and 17(a) have materially distinct language. *Ballay,* 925 F.2d at 691–92. Rather than containing the phrase "prospectus or oral communication," section 17(a) proscribes conduct employed "directly or indirectly ... to obtain money or property by means of any untrue statement." 15 U.S.C. § 77q(a) (1988). While section 17(a)'s "directly or indirectly" language is expansive, section 12(2)'s "prospectus or oral communication" language is restrictive.

The Third Circuit concluded that "the language and legislative history of section 12(2), as well as its relationships to sections 17(a) and 10(b) within the scheme of the 1933 and 1934 Acts, compel our conclusion that section 12(2) applies only to initial offerings and not to aftermarket trading." *Ballay,* 925 F.2d at 693; *see also Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 287 n. 16 (3d Cir.) ("If defendants were eventually to prove that the shares came from the secondary market, § 12(2) would not apply."), cert. denied, —— U.S. ——, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992). Although the writings of some courts, *see, e.g., Elysian Fed. Sav. v. First Interregional Equity Corp.,* 713 F.Supp. 737 (D.N.J.1989); *Scotch v. Moseley, Hallgarten, Estabrook & Weeden Inc.,* 709 F.Supp. 95 (M.D.Pa.1988), and commentators, *see, e.g.,* Therese H. Maynard, *Liability Under Section 12(2) of the Securities Act of 1933 for Fraudulent Trading in Postdistribution Markets,* 32 Wm. & Mary L.Rev. 847 (1991); Adam D. Hirsh, Comment, *Applying Section 12(2) of the 1933 Securities Act to the Aftermarket,* 57 U.Chi. L.Rev. 955 (1990), counsel otherwise, we are persuaded by the Third Circuit's reasoning and hold that section 12(2) of the 1933 Act

does not apply to aftermarket transactions.[13] The district court properly dismissed count 1 of the Miloses' original counterclaim.

## B.

In counts one, two, three, and five of their amended counterclaim, the Miloses alleged that First Union violated Fla.Stat. § 517.301 (1989), committed common law fraud, breached its fiduciary duty, and breached the Margin Agreement.[14] We consider together the Miloses' challenge of the district court's grant of summary judgment on these counterclaims because they are all predicated on common allegations of false representation: (1) that the October 16, 1987 printout of the Miloses' account overstated their equity percentage, and (2) that First Union, acting through Parillo, falsely represented that the Miloses need not cure any margin problems in their account until November 15, 1987.[15] In subpart 1, we explain how each claim hinges on these representations, and, in subpart 2, we demonstrate that these foundational representations cannot shoulder the weight of the Miloses' claims. Hence, we conclude that each counterclaim fails.

### 1.

 The Miloses' brought count one of their amended counterclaim under § 517.-301.[16] To establish a § 517.301 claim, the Miloses had to prove that, in connection with a securities transaction, they justifiably relied on, and were proximately harmed by, a false representation [17] or omission of material

13. Even if we were willing to apply § 12(2) to the aftermarket, the Miloses' section 12(2) counterclaim might not pass muster. Rather than concentrate on particular security transactions, the Miloses suggest that First Union's false representations relate to the general management of their securities portfolio. Section 12(2) seems to contemplate transactions in individual securities; it refers to "a security," imposes liability on the seller *to the person purchasing "such security."*

14. Count four of the amended counterclaim complained only of First Union's negligent provision of printout information. We dispose of this count without lengthy discussion, because, as we explain in part IV.B.2., we will not hold First Union accountable for Pershing's printouts.

An additional obstacle precludes the Miloses' recovery under counts three and four for breach of fiduciary duty and negligence. In *Interstate Securities Corporation v. Hayes Corporation,* 920 F.2d 769, 773 (11th Cir.), *reh'g denied,* 929 F.2d 704 (1991), we noted that, in Florida, "without evidence of personal injury or property damage, a plaintiff cannot raise tort claims to recover solely economic damages flowing from a breach of contract" unless the evidence establishes a tort which is "distinguishable from or independent of [the] breach of contract." (Quoting *AFM Corp. v. Southern Bell Telephone & Telegraph Co.,* 515 So.2d 180, 181 (Fla.1987)). In *Interstate,* a brokerage sued a customer and its guarantor to recover a post-liquidation debit balance in the customer's account. The customer counterclaimed for breach of contract, breach of fiduciary duty, negligent handling of the account, and violation of federal securities laws. The *Interstate* court noted that "the diminution in value of the Hayes account was not damage to property outside the scope of the contract" within *AFM*'s meaning, 515 So.2d at 775, and held that, under Florida law, the customer could not recover damages on either its negligence or its breach of

fiduciary duty claim, *id.* at 775–77. Similarly, the Miloses cannot recover under their negligence or breach of fiduciary duty claim.

15. The Miloses' amended counterclaim is a classic example of a "shotgun pleading." *See, e.g., Pelletier v. Zweifel,* 921 F.2d 1465, 1518 (11th Cir.), *reh'g denied,* 931 F.2d 901 (11th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 167, 116 L.Ed.2d 131 (1991). They framed the amended counterclaim in such a way that it is practically impossible to determine which allegations bear true relevance to which counts, and, moreover, precisely what First Union did to give the Miloses any right of action. That having been said, we glean from the Miloses' allegations only two acts that, according to the Miloses, could have caused them any injury: (1) the October 16, 1987 printout of their account information, and (2) Parillo's representation that the Miloses would not need to cure any margin problems in their account until November 15, 1987.

16. Section 517.301 declares it unlawful for a person, in connection with a security transaction, directly or indirectly

1. To employ any device, scheme, or artifice to defraud;
2. To obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or
3. To engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

Fla.Stat. § 517.301 (1992 Supp.).

17. Of course, First Union's alleged false representation relates to future conduct. As such, the false representation may constitute fraud only if

fact negligently made by First Union. *See Gochnauer v. A.G. Edwards & Sons, Inc.,* 810 F.2d 1042, 1046 (11th Cir.1987) (applying Florida law); *Merrill Lynch, Pierce, Fenner & Smith v. Byrne,* 320 So.2d 436, 440 (Fla. Dist.Ct.App.1975).

█ In count two, the Miloses alleged that First Union committed common law fraud through its false representations. To establish a claim for common law fraud, the Miloses had to demonstrate that they justifiably relied on a false statement of material fact knowingly made by First Union with the intention of inducing the Miloses to act on it. *See Lance v. Wade,* 457 So.2d 1008, 1011 (Fla.1984).

█ In count three, the Miloses claimed that First Union breached its fiduciary duty by falsely representing the equity percentage in the Miloses' account and the time extension to meet margin calls. As a broker, First Union owed the Miloses a fiduciary duty of care and loyalty. *See Gochnauer,* 810 F.2d at 1049. The Miloses' allegations of false representation are necessary to their breach of fiduciary duty claim.

In count five, the Miloses alleged that First Union breached the Margin Agreement in two ways; first, by refusing to honor Parillo's representation of an extension until November 15 to cure any margin problems, and second, by providing false printout information. The pleadings do not explain how the Miloses hoped to concoct a breach of contract claim from these allegations. With considerable generosity, we suppose that they could slip Parillo's representation into paragraph two of the Margin Agreement which subjects First Union's transactions to "the constitution, rules, regulations, customs

and usages of the exchange or market and its clearing house." [18] The second allegation presumes that First Union was responsible for Pershing's printouts.

### 2.

As noted, the Miloses complain of two core representations and urge us to consider them false and fraudulent, to wit, (1) the representation in the October 16 account printout of their equity percentage, and (2) the representation that First Union would give the Miloses until November 15 to cure any margin problems. Neither representation sufficiently supports the Miloses' counterclaims.

█ The first allegedly false representation is the October 16 account printout's overstatement of the Miloses' equity percentage. The Miloses contend that sometime after the initiation of this suit, they discovered that their equity percentage on October 16 was actually less than that reflected in that day's printout. Even if true, this is of no moment. The record is clear that Pershing, not First Union, generated the account printouts. First Union simply gave the Miloses, upon their request, precisely what Pershing provided. Pershing, not First Union, was responsible for any errors in the printouts.

█ The second allegedly false representation was that First Union would extend the time by which the Miloses had to cure their margin problems to November 15, 1987. As far as the Miloses seem to be concerned, First Union could not compel them to satisfy any margin calls until the middle of November; end of story. Indeed, the Miloses have never explained what First Union's representation meant,[19] and we are left to ruminate

First Union made its promise without the intention to perform. *See Royal Typewriter Co. v. Xerographic Supplies,* 719 F.2d 1092, 1104 (11th Cir.1983) (applying Florida law).

18. Although, as subpart IV.B.2. makes clear, such an extension hardly comports with "the constitution, rules, regulations, customs and usages of the exchange or market and its clearing house."

19. At best, Parillo baldly represented to Mr. Milos that he would have until November 15, 1987, to cure any margin problems that might arise in

his account. This representation did not contemplate margin calls generated by external sources like, as here, the NYSE. The representation did not distinguish between house maintenance calls and margin calls. It did not contemplate going astray of federal regulations of margin calls. Parillo's statement did not expressly obligate First Union to front the funds necessary to meet any margin calls in the Miloses' account until November 15, and if it did, the terms of the loan were completely unspecified.

In deposition, Mr. Milos testified about the characteristics of his understanding with Parillo.

on the possibilities. Two alternatives come to mind. The Miloses could not have justifiably relied upon either.

First, the representation could have meant that First Union would prevent any margin call from reaching the Miloses, presumably by manhandling any securities exchange or other entity that sought to issue one. This interpretation is absurd, starkly contravenes public policy, see 12 C.F.R. § 220.4(c)(3)(i) (1992) ("A margin call shall be satisfied within 7 business days after the margin deficiency was created or increased."),[20] and cannot possibly constitute the essence of the representation.

Further, the Miloses could not have justifiably relied on the representation because, when initially made by Parillo on September

> Q. Did you ask [Parillo] whether or not if several margin calls arose you would just owe the cumulative amount of the calls on November 15th?
> A. That was not discussed.
> Q. Did you discuss whether interest would accrue on the amount of the margin calls that might arise?
> A. That was not discussed, but I know they would accrue, the interest would accrue.
> Q. Did you discuss whether the margin status of your account would be ignored and just recalculated on November 15th to determine if you had any margin calls?
> A. We never discussed that.

**20.** The exception to this rule, see 12 C.F.R. § 220.4(c)(3)(ii) (1992), does not apply to this case.

**21.** In their reply brief, the Miloses assert that their failure to read these agreements, which they admit they signed, somehow makes their reliance on Parillo's statement more reasonable. The Miloses' may derive neither comfort nor legal protection from their willingness to sign the contracts without reading them. See Marthame Sanders & Co. v. 400 W. Madison Corp., 401 So.2d 1145, 1146 (Fla.Dist.Ct.App.1981) (those who sign a contract "are charged with knowledge ... of the provisions incorporated into the contract they executed"); cf. Zobrist v. Coal–X, Inc., 708 F.2d 1511, 1518 (10th Cir.1983) (knowledge of contents of prospectus imputed to investor who did not read it).

**22.** In Acme Propane, Judge Easterbrook hypothesized a similar situation similar to that presented here.

> [T]he securities laws are designed to encourage the complete and careful written presentation of material information. A seller who fully

15, 1987, it predated and conflicted with the clear language of the Margin and Option Agreements that provided First Union and Pershing with full discretion to liquidate the Miloses' account without notice.[21] We seriously doubt that the Miloses—and Mr. Milos in particular because he is a sophisticated investor—could justifiably rely on the extension representation after September 22, 1987, the day the Miloses signed the written agreements. Cf. Acme Propane, Inc. v. Tenexco, Inc., 844 F.2d 1317, 1322–23 (7th Cir.1988); Kennedy v. Josephthal & Co., 814 F.2d 798, 804–05 (1st Cir.1987).[22] In no event could the Miloses have justifiably relied on the extension representation after October 20, 1987, when Flowers unequivocally repudiated it and compelled Mr. Milos, under threat of liquidation, to satisfy the margin call.

> discloses all material information in writing should be secure in the knowledge that it has done what the law requires. Just as in the law of contracts a written declaration informing one party of an important fact dominates a contrary oral declaration, so in the law of securities a written disclosure trumps an inconsistent oral statement. Otherwise even the most careful seller is at risk, for it is easy to claim: "Despite what the written documents say, one of your agents told me something else." If such a claim of oral inconsistency were enough, sellers' risk would be greatly enlarged. All buyers would have to pay a risk premium to cover this extra cost of doing business.

844 F.2d at 1322.

The Miloses cite Bruschi v. Brown, 876 F.2d 1526, 1529 (11th Cir.1989), for the proposition that investors may justifiably rely on oral representations that conflict with written agreements. In Bruschi, we explained that circumstances may warrant departure from the usual presumption that reliance on an oral representation that a written representation contradicts is not justified. The circumstances meriting departure in that case are absent here. There, the document was an offering memorandum; here, two written contracts. There, the investor was "unsophisticated and inexperienced in financial matters," id. at 1530; here, Mr. Milos is a sophisticated investor. There, the defendant advised the investor not to read the disclosure documents; here, First Union did no such thing. There, the defendant initiated the security purchase; here, the Miloses had full control over their investments. There, some statements in the disclosure "documents confirmed some of the alleged oral misrepresentations," see id. at 1529; here, the written agreements violently contradict the oral representation. In short, Bruschi's proviso is not apposite.

Second, the representation could have meant that, if a margin call was issued during the relevant time period, First Union would temporarily cover the Miloses' margin obligations, thereby loaning the Miloses money, and expect the Miloses to repay their ensuing debt on November 15, 1987. This alternative is as implausible as the first. Margin requirements regulate the amount of credit that brokers may extend to their customers to prevent brokers from lending too much money. *See Pompano–Windy City Partners, Ltd. v. Bear Stearns & Co., Inc.,* 794 F.Supp. 1265, 1275 (S.D.N.Y.1992) ("The purpose of margin call rules is to protect brokers from the risks associated with insufficiently secured accounts, and to prevent customers from carrying vast exposure in their accounts without adequate capital to cover their positions."); *Sherman v. Sokoloff,* 570 F.Supp. 1266, 1270 n. 14 (S.D.N.Y.1983) ("[T]he central purpose of margin calls [is] to protect the broker, not to give notice to the customer about the result of trading.").

By permitting the Miloses to trade on margin in the first instance, First Union already extended considerable credit. The market's October 1987 flirtation with austerity engendered a substantial deficiency in the Miloses' account. Hence, the margin call. On October 20, 1987, the Miloses' account could not support the then existing level of extended credit; it certainly could not sustain extension of additional credit. In essence, the Miloses want us to hold that they could rely on First Union breaching its duty—to itself as an institution and to its other customers—to issue and enforce the margin call. This we refuse to do.

In *Prudential–Bache Securities, Inc. v. Stricklin,* 890 F.2d 704 (4th Cir.1989), the Fourth Circuit contemplated another put option investor's efforts to resist paying the brokerage house that loaned him the funds on margin that he lost in the October 1987 market crash. Like the Miloses, Stricklin had signed a contract granting the brokerage house discretion to liquidate his account without notice for its protection. One hour after notifying Stricklin of the need for additional margin, the brokerage house closed out his securities positions and bought back all of the put options that he had written. When the brokerage house sued to recover the $100,000–plus deficiency in Stricklin's account, Stricklin counterclaimed that it had wrongfully terminated his positions without the usual 24–hour notice. The court rejected this counterclaim. Justice Powell, sitting by designation, explained that

> A brokerage house should not have to risk a nearly unlimited amount of its own funds while waiting 24 hours to see if a client can meet a margin call.... [The investor's] argument is essentially that, if [the brokerage house] had "loaned" him more money by allowing him to trade without investing any more of his own funds, he could have ... eliminated his debt. This sounds suspiciously like the gambler who is $100,000.00 in debt to the casino arguing that he should not be liable for the debt because if it had just let him borrow another $50,000.00 he would have won the very next hand of poker. As a matter of law, once [the investor] was in debt to [the brokerage house], [the brokerage house] had no duty, contractual or otherwise, to lend [the investor] even more money.

*Id.* at 707. The Miloses similarly contend that First Union should have put more of its funds at risk to buoy the Miloses' trading strategy despite the stock market crash. We simply disagree.

Finally, the Miloses suffered no injury from their alleged reliance on the representation that they need not cure their margin problems until November 15. In "reliance" on Parillo's promise, the Miloses merely maintained their First Union account. After the market crashed, it was too late for the Miloses to resurrect their fallen securities positions. The Miloses losses were the market's doing, not a result of their reliance on the extension until November 15.

The district court properly granted First Union summary judgment on counts one through five of the Miloses' amended counterclaim.

## C.

In count six of their counterclaim, the Miloses claimed that Geraldine Daras, a First

Union employee who was not registered as a broker in Florida, placed several securities orders in violation of Fla.Stat. § 517.12, and they sought rescission under Fla.Stat. § 517.-211 (1989). Section 517.12 provides that "[n]o dealer, associated person, or issuer of securities shall sell or offer for sale any securities ... unless the person has been registered." Section 517.211(1) provides that

> Every sale made in violation of ... s. 517.12 may be rescinded at the election of the purchaser ... or, if the purchaser has sold the security, to pay the purchaser an amount equal to the difference between the amount paid for the security and the amount received by the purchaser on the sale of the security.

The Miloses have not identified a single securities trade placed by Daras or any other unregistered First Union employee for which rescission or damages could be granted. Hence, there is nothing to rescind. Nor is there any particular transaction from which damages may be discerned. Accordingly, the district court properly granted summary judgment for First Union on this count.

### V.

We hold that the district court properly dismissed the section 12(2) count in the Miloses' original counterclaim, and granted summary judgment in favor of First Union on its complaint and the Miloses' amended counterclaim. Accordingly, we affirm.

AFFIRMED.