NOT RECOMMENDED FOR PUBLICATION
File Name: 15a0307n.06

No. 14-3647

**FILED**
Apr 28, 2015
DEBORAH S. HUNT, Clerk

UNITED STATES COURTS OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| TRINA L. BENDER, et al., | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| JULIE A. LOGAN, et al., | ) | SOUTHERN DISTRICT OF |
| | ) | OHIO |
| Defendants-Appellees. | ) | |
| | ) | |
| | ) | |

BEFORE:    SILER, ROGERS, and COOK, Circuit Judges.

ROGERS, Circuit Judge.   Trina Bender, a cosmetologist, partnered with a client, Julie Logan, and Julie's husband Scott Logan to open a cosmetology school called Elite Institute. Julie and Scott Logan created a corporate entity for the school, and Bender signed documents— without reading them—that appointed her an officer and director of the school and gave her non-voting shares amounting to a fifty percent ownership stake in Elite.  Shortly after the school opened, Scott Logan asked Bender to sign some minor paperwork needed for their lawyer. Bender again signed without reading, and this time, the documents purported to sell her fifty percent stake back to the Logans and announce her resignation from her officer and director positions.  Only after the Logans forced her out of the company a few months later did she realize, first, that she had sold her stake and resigned and, second, that the stake she had held was non-voting.  Along with her husband, Bender brought suit, alleging in part that the Logans

committed federal securities fraud with respect to both her acquisition and subsequent sale of shares. The district court granted summary judgment on the securities fraud claim to the Logans, holding that the Benders had failed to present evidence permitting a jury to find that the Logans' misrepresentations had proximately caused any loss to the Benders or that Trina Bender's reliance on the Logans' misrepresentations was justifiable. Because Trina Bender's reliance on the Logans' misrepresentations regarding both transactions was not justifiable, the district court was correct to grant summary judgment in favor of the Logans.

Because this is an appeal from a grant of summary judgment for the Logans, the facts are presented as alleged by the Benders. This case arises out of the founding of a cosmetology school in Portsmouth, Ohio. Trina Bender is a licensed cosmetologist who owned and operated a beauty salon in Portsmouth as of 2010. In the fall of 2010, she told one of her clients, Julie Logan, that she had an ambition to open a cosmetology school and might want to do so with a partner. Julie Logan told Trina Bender that Julie and her husband, Scott, were interested in being her partners. In October, Trina Bender, her husband Mark, Julie Logan, and Scott Logan met to discuss the business. They decided (in the words of the Benders' complaint) that Trina (who would manage the school) and Julie (who would oversee the school's finances) would be "equal partners and equal owners," that Scott would "put up the money," and that Mark would "assume various duties, including security, renovations, and public-relations." Mark and Trina Bender would be employees of the company, earning annual salaries of $60,000.

The timeline for the formation of the school—named Elite Institute, Inc.—and Trina's acquisition of stock in it is somewhat confused, even on the Benders' own version of the facts. What is certain is that Julie Logan executed articles of incorporation creating Elite on December 8, 2010 and filed them with the state of Ohio on December 10. The articles entitled Elite to issue

common stock in two classes: Class A, with "exclusive voting powers in all matters," and Class B, with "no voting power whatsoever, except as may otherwise be provided by law." Trina saw this document for the first time only after litigation commenced. At around the same time, either in a meeting among the four collaborators at a restaurant in December 2010 or at a similar meeting in February 2011, Trina signed a number of documents formalizing her role in the company and her share ownership. The complaint alleges that in a meeting in December 2010 the Logans presented Trina with an employment contract with an annual salary of $30,000. Trina protested that the salary figure was incorrect, and Scott and Julie promised to correct it. Trina recalls that at this or another meeting in December, Julie and Scott told her that she would be a "50/50 partner," which she took to mean that control would be shared equally.

According to the complaint, Trina signed the papers relating to her share ownership on February 15, 2011. These documents included: a "Written Consent in Lieu of the First Meeting of the Board of Directors," which appointed Trina as president and Julie as Secretary and Treasurer and noted that Julie had subscribed to 50 Class A shares and Trina to 50 Class B shares; an "Action of Shareholders" appointing Julie and Trina as the Directors; a "Subscription to Shares" noting that Julie subscribed for 50 Class A shares and Trina subscribed for 50 Class B shares; and a stock certificate showing Trina's ownership of 50 shares of Elite's "Class B Nonvoting Stock." Of the documents Trina signed, only the stock certificate indicated that Trina's stock was "nonvoting," but all of the documents relating to stock ownership made clear that Trina's stock was not the same class as Julie's. Trina did not read the documents she signed, instead relying on Scott Logan to read and explain them. The Logans' attorney kept custody of all documents, including Trina's stock certificate. It appears that Trina paid nothing for her shares. Over the next several months, Trina prepared for the school's opening and Mark

oversaw the renovations of the building (which was leased from a holding company owned by the Logans) that Elite would occupy. The school finally opened in May 2012. Trina never received any salary payments from Elite.

According to Scott Logan, the school failed to meet the expectations for financial performance in its business plan. The partners had anticipated that the school would only need to be open for one year before its students could start receiving financial aid, but in reality the school would have to be operational for two years before accreditation, and financial aid, would become available. Trina alleges that Scott knew from the beginning that it would take two years of operation to obtain accreditation. Scott claims that on June 20, 2012, he expressed concerns to Trina about Elite's finances, including concerns about excessive business expenses caused by Trina's decisions. Scott claims that he suggested to Trina that, in order to make it financially feasible for the Logans to continue funding Elite until it became profitable, she should resign from Elite and sell her shares to Julie, so that he could claim the full amount of Elite's losses on his tax returns, the savings from which he would reinvest in the school.

Trina claims (and, in this procedural posture, we accept) that this conversation never took place. Instead, she alleges that Scott effectively tricked her into selling her shares and resigning from Elite. On July 28, 2012, Scott sent Trina a text message asking her to meet him to sign some documents: "Trina I've got paperwork that needs to be signed by u n Julie for lawyer[.] Nothing major[.] Just left over stuff unsigned from 2011 business year and beginning of 2012[.] I think I need 4 signatures from you 2 min max." Trina went to the Logan home, where she signed documents whose contents were obscured by Scott. While signing, she jokingly asked Scott whether she was signing over her house and car, to which Scott repeated that it was "just some paperwork." Three of the documents are of note: a Stock Purchase Agreement in which

Trina sold her 50 Class B shares to the "Julie A. Logan Revocable Trust" for a total of one dollar, a document stating that Trina was resigning as an officer and director of Elite, and an Action of Directors approving the transfer of Trina's shares and her resignation. All three documents, though executed in July 2012, were marked effective December 31, 2011. Trina was not aware of the legal effect of the documents at the time she signed them.

Trina and her husband Mark continued to work at Elite until early October 2012. On September 26, 2012, Elite's attorney offered Trina a "nominal sum" in exchange for relinquishing all stake and participation in Elite. Trina refused. On October 4, Trina received a letter from Elite's attorney offering her a choice: she could sign a "Settlement Agreement," or else the business would be shut down and Trina would be held personally liable for half of the company's debt, or approximately $500,000. Around the same time, Mark received a letter terminating his employment at Elite. Trina did not sign the Settlement Agreement, but instead obtained counsel.

On December 13, 2012, Trina and Mark Bender filed suit against Julie Logan, Scott Logan, Elite, and business entities controlled by the Logans that were involved in Elite's financing. The amended complaint, filed on June 5, 2013, alleges that the Logans violated Section 10b of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, with respect to Trina's acquisition and subsequent sale of stock in Elite. The Benders also pled several state law causes of action arising from their dealings with the Logans that are not at issue in this appeal.

The Logans and their businesses filed a motion for summary judgment on February 12, 2014. On June 3, 2014, the district court granted the motion for summary judgment as to the securities fraud claim, and declined to exercise jurisdiction over the Benders' remaining state law

claims. The district court first dismissed the non-personal defendants, as the Benders had not alleged that these defendants made any false statements or omissions. Although the district court discussed scienter and materiality, it based its dismissal of the Benders' securities fraud claim on the Benders' inability to prove two elements: loss causation and justifiable reliance. Regarding loss causation, the district court held that the Benders' experts' analysis was insufficient to prove the value of Trina's stake in Elite, because it was based on the economic performance of other cosmetology schools and did not analyze Elite's prospects in particular. Further, there was no loss causation because Julie and Scott did not make "any specific representations to [Trina] about the potential profitability of the school or the potential value of Elite stock in order to induce her to become a shareholder or director of the corporation," so they did not proximately cause her failure to recoup a profit from the enterprise. Regarding reliance, the district court held that Trina "has not established that she reasonably and justifiably relied upon" any of Julie's or Scott's statements because she could always have read the documents she signed. In so holding, the district court noted that Trina had some post-high school education and was a successful business owner, and that the documents she signed (at both her acquisition and her sale of the stock) were not so complex that she would not have understood what she was signing had she attempted to read them. Therefore, the district court granted the Logans summary judgment on the securities claim, and dismissed the state law claims without prejudice. The Benders appeal.

Trina Bender did not justifiably rely on the Logans' misrepresentations when entering into either of the transactions at issue in this appeal. As analyzed by the district court and the parties, securities fraud consists of the following four elements, when established in connection with a securities transaction: "[1] the misstatement or omission of a material fact, [2] made with scienter, [3] upon which the plaintiff justifiably relied and [4] which proximately caused the

plaintiff's injury [loss causation]." *In re Comshare Inc. Securities Litigation*, 183 F.3d 542, 548 (6th Cir. 1999). Because securities fraud is fraud committed "in connection with the purchase or sale of any security," the plaintiff must prove all of the elements of securities fraud with respect to a single transaction of securities. 17 C.F.R. § 240.10b-5. There were two transactions here that could serve as the predicate transaction for a securities fraud claim: Bender's acquisition of Elite stock and her sale of Elite stock. The Benders cannot assert a securities fraud claim based on Bender's acquisition of stock in Elite because Trina Bender was not justified in relying on the Logans' misrepresentations. The Benders also cannot assert a securities fraud claim based on Bender's sale of stock in Elite for similar reasons. In both transactions, the documents Trina signed would have informed her, had she read them, of the relevant facts that the Logans allegedly obfuscated. In neither case do her background, the nature of her relationship with the Logans, and the attendant circumstances excuse her failure to read the documents she signed.

When Trina Bender acquired Elite stock, her decision to rely on the Logans' rather general statements about the structure of the company and not attempt to read—or ask detailed questions about—the contents of the documents that she signed was unjustifiable. Whether reliance is justifiable is analyzed under a recklessness standard, and the relevant factors include:

> (1) The sophistication or expertise of the plaintiff in financial and securities matters; (2) the existence of long standing business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations.

*Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901, 921 (6th Cir. 2007). The most salient point is that, because Bender had the documents in front of her when she signed them and the Logans never prevented her from attempting to read them, she had perfect access to the relevant information and a perfect opportunity to detect the fraud. This is particularly true in the case of

the stock certificate, which clearly stated that she was receiving "nonvoting stock." Bender admitted that had she read the certificate, which was not a long or complex document, she would have noticed the nonvoting "red flag."

Bender's failure to read the documents she signed, documents which would have clearly revealed the Logans' misrepresentation, makes it difficult to show that her reliance was justifiable. Had Bender read the stock certificate and nonetheless relied on the Logans' representation that was contradicted by it, her reliance would almost certainly have been unreasonable. Not wishing to place investors who read documentation in a worse position than investors who do not, the Tenth Circuit has held that "knowledge of information contained in a prospectus or an equivalent document authorized by statute or regulation[] should be imputed to investors who fail to read such documents." *Zobrist v. Coal-X, Inc.*, 708 F.2d 1511, 1518 (10th Cir. 1983). While not always dispositive, failure to read documents renders reliance on oral statements unjustifiable except in extraordinary circumstances. Similarly, the Eleventh Circuit applies a "presumption that reliance on an oral representation that a written representation contradicts is not justified." *First Union Discount Brokerage Servs., Inc. v. Milos*, 997 F.2d 835, 846 n.22 (11th Cir. 1993). At the very least, when documents available to the plaintiff clearly unmask an oral misrepresentation, "a strong showing" on the other factors is necessary for the plaintiff to prevail. *In re Prudential Ins. Co. of America Sales Practices Litigation*, 975 F. Supp. 584, 612 (D. N.J. 1996).

The district court's conclusion is also supported by Bender's inability to show that signing documents without attempting to read them was reasonable and justifiable in this case. Bender was inexperienced in matters of investment and finance, but she was an experienced business owner who demonstrated some familiarity with contracts. In fact, she noted a

discrepancy in the proposed employment contract presented to her by the Logans; not attempting to read other documents that she signed at approximately the same time thus appears even less defensible. At the time that she acquired the stock, Scott and Julie Logan were somewhere on the spectrum between social acquaintances and friends, but they were not yet Bender's business partners, and certainly they owed her no fiduciary duty. Nor did they conceal the fraud; Bender admitted that she was not prevented from reading the documents she signed. The Logans' misrepresentation—that Bender would be a 50/50 partner—was so general in nature that Bender might reasonably have wanted to read the documents she signed to better understand what her role in the company would be. The only factor clearly in Bender's favor is that the Logans prepared the documents and presented them to Bender for her signature; she initiated the process of founding Elite, but not the process of acquiring shares in it. These factors require the conclusion that Bender's reliance was not reasonable.

This accords with common sense. A reasonable small business owner entering into a partnership of this nature would seek to understand exactly what rights and responsibilities she would have in the new company. Bender and the Logans had previously discussed what each individual's role would be in the company, and it would have been prudent to attempt to check that the paperwork confirmed, rather than contradicted, Bender's interpretation of the partners' common understanding. Bender was thus reckless in relying on the Logans' alleged misrepresentations regarding her control of Elite, and so her reliance on those representations in acquiring shares of Elite was not justifiable.

Although the issue is closer, Trina Bender was also not justified in relying on Scott Logan's misrepresentations in selling her Elite stock. This transaction differs from Bender's acquisition of stock in a few respects. Here, all alleged misrepresentations were made by Scott

Logan alone. By the summer of 2012 Logan was the spouse of Bender's business partner, and he generally managed Elite's finances without consulting Bender. They thus had a more complex business relationship than when the Benders and Logans founded Elite. Logan's misrepresentations were less specific as to the content of the documents Bender signed, but more specific as to their importance; while he did not tell her anything of their contents, he effectively told her they were minor documents with little practical import.

While these differences suggest that Bender's reliance was more justifiable on this occasion, others point in the opposite direction. Bender had by this point been President of Elite for over a year, and so should have had a greater understanding of the importance of reading corporate documents before signing them. Further, she had some reason to suspect that the Logans' interests might in some cases be adverse to hers and appears to have been aware of the risk she was taking in signing the documents. Overall, the force of Bender's relationship of trust with Scott Logan was not sufficient to overcome the fact that she signed documents without reading them or making more than a minimal inquiry into their contents.

While it appears that Bender trusted Scott Logan to manage Elite's finances and corporate documentation, this trust was itself not reasonable. The record shows that Scott and Julie Logan intentionally and consistently insulated Bender from the financial affairs of Elite. Bender's testimony indicated that the Logans essentially demanded that Bender trust them in this area:

> A: . . . [I]f I asked questions about certain things, Scott asked me to stay in my, you know, he said, [Julie will] stay and do what she's supposed to do, you stay and do what you're supposed to do. If I asked questions about the finances, you know,
>
> Q: None of your business?

> A: Right. Like they didn't want me to—not necessarily none of my business, but they would get a little mad. So I tried to focus on what I was bringing to the partnership, which was the cosmetology.

Bender also described at least one specific instance in which Scott Logan replied to an inquiry about Elite's finances by saying he would "get with Julie because she knew more about the finances of the school." Thus, the nature of the partnership appears to have been that Bender ceded all financial decisionmaking to Julie and Scott Logan. Scott Logan appeared to be invoking this particular relationship of trust when he referred to "paperwork that needs to be signed" by Bender "for [the] lawyer." Moreover, Logan's misrepresentation effectively asked Bender not to read the documents, or at least, not to read them carefully: "I think I need 4 signatures from you 2 min max," and he described the documents as "nothing major." These two factors—a relationship of trust and advice not to read the document to be signed—were both present in one of the relatively few cases to hold that a plaintiff reasonably relied on oral misrepresentations when reading documentation would have revealed the fraud. *Bruschi v. Brown*, 876 F.2d 1526, 1530 (11th Cir. 1989).

However, it was not reasonable for Bender to trust Scott Logan with Elite's finances. This is reflected in a distinction between this case and *Bruschi*: in that case, the defendant had a formal "fiduciary obligation" to act in the plaintiff's best interests, whereas here there was no legal relationship whatsoever between Scott Logan and Bender. *Id.*; *see also Nolfi v. Ohio Kentucky Oil Corp.*, 675 F.3d 538, 548 (6th Cir. 2012). The existence of a fiduciary obligation allows the plaintiff to assume, absent clear evidence to the contrary, that the defendant can be trusted. Bender could not legally expect any particular loyalty from Scott Logan, and as a matter of fact she did appear willing to take the initiative in at least some financial matters. In June of 2012, just one month before she trusted Scott Logan in selling her shares, Bender "requested a meeting with . . . Scott Logan in order to discuss her concerns about improper expenditures at

Elite," namely, Julie Logan's and her daughters' personal use of Elite's beauty products, and she also expressed concerns that she had not received her agreed salary. This suggests that Bender was aware that the Logans' interests might diverge from hers and that the Logans did not always make decisions in the best interest of Elite. It was therefore not reasonable, at least for federal securities law purposes, for Bender to trust Scott Logan entirely with what seemed to be financial paperwork, to the point that she did not even make a minimal inquiry into its contents. As president of Elite, Bender's actions exposed her company, as well as herself, to potential liability, which gave her a heightened obligation to be careful about what she was signing. In this context, Bender's complete trust in Scott Logan was reckless.

Further, Bender showed some awareness of the particular risk she was taking signing documents given to her by Scott Logan without first reading them or inquiring seriously as to their contents. Bender's joke about signing away her house and car shows that she knew, even as she was signing the documents that purported to sell her share of Elite, that signing documents without reading them is dangerous. Bender knew she was taking a risk by signing the documents, and, given her experiences with the Logans to that point, she should have known that that risk was unreasonable. Bender apparently did not read the documents she signed because she "didn't want [the Logans] to think [she] didn't trust them." Under the circumstances of this case, when she was or should have been aware of the dangers posed by signing the documents, being guided by that social motivation was not justifiable.

Because our analysis of the justifiable reliance element is sufficient to resolve this appeal, it is not necessary for us to address the Benders' arguments regarding loss causation. Moreover, our analysis is only of the justifiable reliance element of the Benders' federal securities fraud claim, and we do not address any element of their state law claims.

For the foregoing reasons, the district court's grant of summary judgment to the Logans is **AFFIRMED**.